(No. 52957.—

PATRICIA POLICH *et al.*, Petitioners, v. CHICAGO
SCHOOL FINANCE AUTHORITY *et al.*, Respondents.

*Opinion filed March 11, 1980.*

MORAN, J., dissenting.

Wilson & Strawn, of Chicago (Edward J. Wendrow, Calvin Sawyier, Edward L. Foote and Thomas J. Campbell, of counsel), for petitioners.

Albert E. Jenner, Jr., Anton R. Valukas, Michael J. Rovell, John H. Mathias, Jr., Linda L. Listrom, and Robert T. Markowski, of Chicago (Jenner & Block, of counsel), for respondent Chicago School Finance Authority.

William R. Quinlan, corporation counsel, of Chicago (Martin Healy and Lee J. Schwartz, assistant corporation counsel, of counsel), for respondent City of Chicago.

DeJong, Poltrock & Giampietro (Lawrence A. Poltrock, Wayne B. Giampietro, Kathrin A. Koenig, Gregory N. Freerksen, and Stephen G. Daday, law student, for amicus curiae Chicago Teachers Union, Local No. 1, AFL-CIO.

MR. CHIEF JUSTICE GOLDENHERSH delivered the opinion of the court:

Pursuant to leave granted (73 Ill. 2d R. 381), petitioners, Patricia Polich, Norm Gierke, William Gierke, Gunthorp-Warren Printing Co., B. S. Miller and Herbert

Loeb, filed this original action (Ill. Const. 1970, art. VI, sec. 4(a)) relating to revenue seeking a declaratory judgment that the School Finance Authority Act and other provisions of Public Act 81—1221, approved January 16, 1980, are invalid.

Petitioner Polich is a citizen and resident of the city of Chicago, petitioners Gierke are teachers employed by the board of education of the city of Chicago (the Board), and Gunthorp-Warren Printing Co. is an unsecured creditor of the Board. Petitioners Miller and Loeb are holders of board of education bonds maturing respectively on October 15, 1987, and December 1, 1981.

The relevant portions of Public Act 81—1221 will be set forth to the extent necessary to the discussion of the issues. The respondent, Chicago School Finance Authority (the Authority), is governed by a five-member board of directors, two of whom were appointed by the Governor with the approval of the mayor of Chicago; two directors were appointed by the mayor of Chicago with the approval of the Governor, and one director, appointed jointly by the Governor and mayor, serves as chairman of the Authority. Sec. 34A—301.

Prior to consideration of the substantive issues presented, we deem it advisable to comment briefly on our exercise of jurisdiction over an original action which presents no actual controversy concerning the collection of revenue. Historically (Ill. Const. 1818, art. IV, sec. 2; Ill. Const. 1848, art. V, sec. 5; Ill. Const. 1870, art. VI, sec. 5) this court has been vested with original jurisdiction in matters relating to the revenue, and neither the framers of the constitutions nor this court have deemed it necessary to precisely define the term "revenue" as used in those constitutions. The jurisdiction has been sparingly exercised in causes involving issues relating to the revenue and of great public importance (see *People v. Deep Rock Oil Corp.* (1931), 343 Ill. 388; *Thorpe v. Mahin* (1969), 43 Ill. 2d 36; *Dee-El Garage, Inc. v. Korzen* (1972), 53

Ill. 2d 1; *Continental Illinois National Bank & Trust Co. v. Zagel* (1979), 78 Ill. 2d 387), and is appropriately asserted here.

In addition to the creation of the School Finance Authority, Public Act 81—1221 provided for the termination of the terms of all members of the school board effective April 30, 1980, and the appointment of a new board (sec. 34—3); reduced the maximum tax rate for educational purposes from 2.11% to 1.61% (sec. 34—53); provided for the reduction of the State aid funds payable to the school district under section 18—8 by an amount equal to the budget for the operations of the Authority, and payment of that sum to the Authority (sec. 18—8(k)); and enumerated the powers of the Authority in the control of the finances and expenditures of the Board.

Section 34A—401 of the Act provided that the Authority "shall have the power to approve or to reject the Financial Plans, Budgets and Contracts of the Board," and other provisions detail the manner in which the Authority is empowered to supervise the fiscal affairs of the Board. (Secs. 34A—401 to 411.) In order that it may carry out its fiscal duties and provide the Board with moneys with which to operate, the Authority was empowered by section 34A—501 to issue general obligation bonds in an amount not to exceed $500 million. Section 34A—503 provides in part:

> "(a) Before or at the time of issuing any Bonds, the Authority shall demand and direct the City Council of the City to provide by ordinance for the levy and collection of a direct annual tax upon all the taxable property located within the school district without limit as to rate or amount sufficient to pay and discharge the principal thereof at maturity or on sinking fund installment dates and to pay the interest thereon as it falls due. The taxes as levied shall also include such additional amounts to the extent that the collections in the prior years were insufficient to pay and discharge such principal thereof at maturity, such sinking fund installments, if any, and interest thereon as it fell due

and the amount so collected shall be placed in the debt service reserve fund. The City Council of the City shall levy and collect such tax as directed by the Authority. Such tax shall be in addition to and exclusive of the maximum of all taxes which the Authority, the Board or the City Council of the City is now, or may hereafter be, authorized by law to levy for any and all school purposes. Any such ordinance shall be in force upon its adoption."

Petitioners contend that "the amendatory Act, in setting up the Authority with supervisory fiscal powers over the Board of Education and the power to incur debt and compel the Chicago City Council to levy taxes in order to pay the same, clearly violates the constitutional home rule powers of the City." They argue that the Act confers upon the Authority complete control over the financial affairs of the board of education and compels the city council to levy and collect such taxes as may be directed by the Authority. Simply stated their contention is that, in violation of the constitutional home rule powers of the city, the statute grants the power to control the amount of money to be raised by taxes for the operation of the schools to persons other than the corporate authorities of the city of Chicago or persons selected and approved by them. Cited in support of this position are *People ex rel. Vermilion County Conservation District v. Lenover* (1969), 43 Ill. 2d 209, *People ex rel. Bergan v. New York Central R.R. Co.* (1945), 390 Ill. 30, *People ex rel. Burow v. Block* (1916), 276 Ill. 286, *Morgan v. Schusselle* (1907), 228 Ill. 106, and *Lovingston v. Wider* (1870), 53 Ill. 302. In *Lovingston,* decided under the 1848 Constitution, the General Assembly passed an act intended to establish a police force for East St. Louis. The act provided for the appointment by the Governor of three commissioners who would control the police department. The city was required to appropriate funds for the operation of the department, but failing that, the commissioners were empowered to issue certificates of indebtedness in the name of the city which were to be paid out of taxes. In

holding that the legislature had exceeded its powers under article IX, section 5, of the Constitution of 1848, the court said:

"The validity of this act can hardly be considered an open question in this court, since the decision of *The People ex rel. McCagg v. The Mayor of Chicago,* 51 Ill. 17; Same *ex rel. Wilson v. Salomon,* ib. 37; Same *ex rel. South Park Commissioners v. The Common Council of Chicago,* ib. 58, and *Harward v. St. Clair Drainage Company,* ib. 130.

We held, in these cases, that the fifth section of the ninth article of the constitution, authorizing the legislature to give the corporate authorities of cities and towns the right of taxation for corporate purposes, was to be construed as a limitation upon the power of the legislature to grant the right of corporate or local taxation to any other persons than the corporate or local authorities. We further held, that, by corporate authorities, as used in this clause of the constitution, must be understood those municipal officers who are either directly elected by the people of the .municipality, or appointed in some mode to which they have given their assent. We further held, in the first of the above cited cases, that the commissioners of Lincoln Park were not corporate authorities, and in the last case, that the drainage company were not such authorities within the meaning of the constitution.

These cases, in our judgment, are conclusive against the validity of the act under consideration. These police commissioners are not the corporate authorities of East St. Louis, and, therefore, can have no power of taxation." 53 Ill. 302, 304-05.

Article IX, section 9, of the Constitution of 1870, in force when the other cases cited were decided, provided in

part:

> "The general assembly may vest the corporate authorities of cities, towns and villages with power to make local improvements by special assessment, or by special taxation of contiguous property, or otherwise. For all other corporate purposes, all municipal corporations may be vested with authority to assess and collect taxes; ***."

The Constitution of 1970 contains no comparable provision. Arguing that "an examination of the debates shows no intent to change the basic concept of the power to tax as enunciated in the cases cited above," petitioners seek to have us hold that under the present constitution the power of the General Assembly is similarly restricted. They argue that to qualify "the right of a home rule unit, having the taxing power, to decide when it will levy a tax" violates article VII, section 6, of the 1970 Constitution, which provides in part:

> "Except as limited by this Section, a home rule unit may exercise any power and perform any function pertaining to its government and affairs including, but not limited to, the power to regulate for the protection of the public health, safety, morals and welfare; to license; to tax; and to incur debt."

As shown by the quotation from *Lovingston v. Wider* (1870), 53 Ill. 302, the constitutional provision pertaining to municipal taxing authority was construed as a limitation on the power of the General Assembly to grant the right of local taxation to anyone but the "corporate authorities."

Article IX, section 1, of the 1970 Constitution provides in part:

> "The General Assembly has the exclusive power to raise revenue by law except as limited or otherwise provided in this Constitution."

This court, considering the scope and meaning of article IX, section 1, said in *Hoffmann v. Clark* (1977), 69 Ill. 2d 402, 422-23:

"In discussing the nature of the power of the General Assembly under the revenue article, this committee [Committee on Revenue and Finance, Constitutional Convention, 1970] explained that it 'vests the power to raise revenue in the General Assembly except to the extent that the constitution grants such power to local governments or otherwise limits the legislature's authority.' (7 Proceedings 2062.) And further the committee stated:

> 'Indeed, the inherent power of government to tax is so well established that it would undoubtedly be held to exist even in the absence of any constitutional provision authorizing it. *** As a result, any attempt to grant a specific taxing power in a state constitution becomes, in effect, a limitation on the inherent power. The Committee does intend to place limits upon the General Assembly in its exercise of the tax power, but those limits are *expressly* stated and they are *exclusive*. The Committee believes that it is very important to avoid the narrow and often unintended limitations which resulted from court interpretations of the existing constitutional provisions and which might again result if we were to attempt to spell out affirmatively and in detail the state's taxing powers.
>
> The proposed wording achieves this objective by affirming the sovereign power of the state and the General Assembly in Section 1 and then, in later sections, setting forth the specific restrictions which are intended to circumscribe the scope of the taxing power.
>
> Section 1 allows the General Assembly broad latitude in imposing taxes ***. The Committee did not list these taxes in the proposal, however, because of the danger that a court might interpret any omission as a denial of the power to impose a tax not specifically named in the constitution. *** The Committee's approach, in not listing taxes which the legislature may impose, recognizes that during the life of this constitution forms of taxation, or variations of existing forms, may be developed which the state should be free to

adopt if its elected representatives so choose.

The Committee believes that the General Assembly presently has the power to levy all kinds of taxes. *** This proposal eliminates any doubt on that score. It permits the General Assembly to concentrate on the merits of tax policy rather than upon the constitutionality of a particular form of taxation and it *places the formulation of tax policy in the legislature, where it belongs, rather than in the courts.'* (Emphasis added.) 7 [Record of] Proceedings [Sixth Illinois Constitutional Convention] 2066-67.

From these explanations there can be no doubt that it was intended that the power to raise revenue through taxation is firmly vested in the General Assembly both through the inherent power of that body, and by the specific grant of the Constitution. It is further clear that it was the intent of the committee that this power be subject to only such limitations as are *expressly* stated in the Constitution and that the express limitations are to be *exclusive.* It was further clearly a concern of the committee that through court construction 'narrow' and 'unintended' limits might be placed upon the General Assembly's power."

In view of the foregoing, we conclude that, contrary to petitioners' contention, the convention proceedings demonstrate the clear intent to change the extent to which the General Assembly may delegate the power to tax. The restrictions imposed by the cases cited by petitioners are no longer applicable. Because we consider that the issue of the validity of section 34A–503 presents only the question of the General Assembly's power to tax, we find it unnecessary to address the suggestion raised in respondent city of Chicago's brief that because the Act is a limitation on the taxing power of a home rule municipality, a three-fifths majority was needed to pass the bill (Ill. Const. 1970, art. VII, sec. 6(g)). We note, parenthetically, that article IX, section 10, of the Constitution provides:

"This Article is not qualified or limited by the provisions of Article VII of this Constitution concerning the size of the majorities in the General Assembly necessary to deny or limit the power to tax granted to units of local government."

We note further that article VII, section 8, of the 1970 Constitution empowers the General Assembly to provide for the "selection" of the officers of school districts, special districts and other units of local government. This negates petitioners' contention, made in reliance on cases decided under prior constitutions, that members of the Authority must be elected or appointed in a manner approved by the voters of the city of Chicago.

Concerning the provision of section 34A—503 that "the Authority shall demand and direct the City Council *** to provide by ordinance for the levy and collection of a direct annual tax ***," we note that sections 34—22.2, 34—22.4, 34—22.7 and 34—3 of the School Code (Ill. Rev. Stat. 1977, ch. 122, pars. 34—22.2, 34—22.4, 34—22.7, 34—3) contain provisions which are substantially similar. In *Latham v. Board of Education* (1964), 31 Ill. 2d 178, 181-82, in rejecting the contention that the board of education rather than the city council made the tax levy for the Chicago school system, the court said:

> "The fallacy of plaintiffs' argument that the Board makes the levy is clear when we consider that even though all preliminary steps have been taken by the Board and a final budget has been adopted, not a penny of school taxes will be forthcoming without the adoption by the city council of an ordinance levying the tax."

The rationale of *Latham* is applicable here.

Section 34A—510 of the Act provides:

"The State of Illinois pledges to and agrees with the holders of Bonds that the State will not limit or alter the rights and powers vested in the Authority by this Act with respect to Sections 34A—501 through 34A—512 hereof so as to

impair the terms of any contract made by the Authority with such holders or in any way impair the rights and remedies of such holders until the Bonds, together with interest thereon, with interest on any unpaid installments of interest, and all costs and expenses in connection with any action or proceedings by or on behalf of such holders, are fully met and discharged or provisions made for their payment. The Authority is authorized to include such pledge and agreement of the State in any resolution or contract with the holders of Bonds." Pub. Act 81—1221.

Petitioners contend that, in effect, the foregoing provision "purports to prevent future legislatures from ever amending the School Code to abolish the Authority." They argue too "that the Act in question in effect prevents future legislatures from abolishing the Authority which lasts as long as it has any 30-year bonds outstanding." Citing *People ex rel. City of Chicago v. Barrett* (1940), 373 Ill. 393, they argue: "The General Assembly has the undoubted right to repeal all legislative acts which are not in the nature of a private grant ***." "A General Assembly cannot bind its successors unless authorized by the Constitution ***." In *Hoogasian v. Regional Transportation Authority* (1974), 58 Ill. 2d 117, section 4.04(e) of the Regional Transportation Authority Act (Ill. Rev. Stat., 1973 Supp., ch. 111 2/3, par. 704.04), which contained language substantially similar to that involved here, was attacked on the ground that it created "State debt." The court held that the provisions did "nothing more than recognize an already existing obligation on the part of the State to the Authority's note and bond holders not to impair their contractual relationship with the Authority ***." (58 Ill. 2d 117, 128.) In *Day v. Regional Transportation Authority* (1977), 66 Ill. 2d 533, it was again contended that the provision under attack in *Hoogasian*, coupled with the provision providing for allocation of certain taxes, served to create State debt. Under the rationale of *Hoogasian* that contention was rejected. We fail to perceive in what manner the section binds future

General Assemblies and hold that as in the legislation considered in *Hoogasian* and *Day* the clause expresses the intent to provide protection to the bondholders consistent with the constitutional provisions prohibiting impairment of contractual rights. U.S. Const., art. I, sec. 10; Ill. Const. 1970, art. I, sec. 16.

Petitioners contend next that Public Act 81—1221 is invalid for the reason that in reducing the board of education's authorized tax rate and eliminating its control over the allocation of revenues to and among its various creditors, it impairs the obligation of contracts. The Act amends section 34—53 of the School Code to reduce the maximum tax rate for educational purposes from 2.11% to 1.61%. Section 34A—404 requires the Board to submit budgets for the Authority's approval or rejection. Section 34A—405 empowers the Authority to adopt regulations identifying categories and types of contracts which must be submitted by the Board to the Authority for its approval or rejection. Section 34A—409 empowers the Authority to direct the Board's treasurer to establish and maintain the Board's cash accounts in the manner prescribed by the Authority and further empowers the Authority to assume exclusive administration of the Board's cash and bank accounts and to withdraw funds from these accounts for the Board's lawful expenditures.

*Faitoute Iron & Steel Co. v. City of Asbury Park* (1942), 316 U.S. 502, 86 L. Ed. 1629, 62 S. Ct. 1129, involved a New Jersey statute under which a plan for adjustment of the claims of creditors of insolvent municipalities could be made binding upon all creditors. The statute was attacked as an impairment of the right of contract in violation of article I, section 10, of the Constitution of the United States. The Supreme Court held that the enactment of the legislation was within the police power of the State and that the legislation was valid. Similarly, in *Community Renewal Foundation, Inc. v. Chicago Title & Trust Co.* (1970), 44 Ill. 2d 284, 290,

this court observed:

"It is appropriate to observe that the contract clause of the Federal constitution is not to be considered an absolute restriction or prohibition against the affecting of contracts and that the clause recognizes that they may be subject to the reasonable and legitimate exercise of the police power of the State. (See *Home Building & Loan Ass'n v. Blaisdell,* 290 U.S. 398, 447, 78 L. Ed. 413, 54 S. Ct. 231.) Where the State properly exercises this power for the general welfare, even though contracts and rights established by them are affected by its action, the exercise of this power is not an unconstitutional infringement of the contract clause. Such an exercise of police power will be considered superior to rights created under a contract between individuals. *East New York Savings Bank v. Hahn,* 326 U.S. 230, 90 L. Ed. 34, 66 S. Ct. 69; *Home Building & Loan Ass'n v. Blaisdell,* 290 U.S. 398; *City of Chicago v. Chicago and North Western Ry. Co.,* 4 Ill. 2d 307; and *Vissering Mercantile Co. v. Annunzio,* 1 Ill. 2d 108."

In section 34A—102 the General Assembly found:

"(ii) A sound financial structure is esstential to the continued operation of any school system. It is vital to commercial, educational and cultural interests that the public schools remain in operation. To achieve that goal, public school systems must have effective access to the private market to borrow short and long term funds.

(iii) To promote the financial integrity of boards of education of cities having a population exceeding 500,000, it is necessary to provide for the creation of school finance authorities with the powers necessary to promote sound financial management and to assure the continued operation of the public schools."

We are unable to say that the General Assembly erred in finding that the enactment of the legislation was within

the necessary and appropriate exercise of its police power. We hold, therefore, that the enactment of the legislation was not an impairment of contract proscribed by either the United States Constitution or the Constitution of Illinois.

Petitioners contend next that the Act is invalid because it "constitutes a direct disavowal by the State of Illinois of its constitutional obligation to provide and finance an efficient system of high quality public education." Petitioners assert that under the Act, the State "assumes absolutely no added obligations" in dealing with the financial crisis facing the Chicago school system.

Article X, section 1, of the 1970 Constitution provides:

> "SECTION 1. GOAL—FREE SCHOOLS
>
> A fundamental goal of the People of the State is the educational development of all persons to the limits of their capacities.
>
> The State shall provide for an efficient system of high quality public educational institutions and services. Education in public schools through the secondary level shall be free. There may be such other free education as the General Assembly provides by law.
>
> The State has the primary responsibility for financing the system of public education."

Petitioner does not assert that the State contributes nothing toward the public educational institutions and services for Chicago. Indeed the contrary is true. Under section 18.8 of the School Code (as amended by Pub. Act 81—1221), the State is still obligated to make aid payments, based on attendance, to the school district and the Authority. Also we note that in December of 1979 the State provided emergency funds to the school district both in the form of an advance of State payments and loans in the form of State aid payment anticipation certificates. The Board guaranteed that payment of the principal and interest on the loans would be made out of State aid payments for future months. This, we note, was accom-

plished without new legislation.

Apparently petitioners' position is that the State, under the Constitution, is required to provide direct cash payments in order to alleviate this crisis rather than make provision, as it has done, for bond financing and repayment out of city taxes. We cannot agree.

In *Blase v. State* (1973), 55 Ill. 2d 94, the court construed the last sentence of section 1, article X, of the Constitution of 1970, which reads "The State has the primary responsibility for financing the system of public education." The plaintiffs in that case contended that the Constitution required that the State provide at least 50% of the cost of public education. Rejecting that assertion, the court said:

> "In view of the history of the proposal and the repeated explanations of its principal sponsor, it cannot be said that the sentence in question was intended to impose a specific obligation on the General Assembly. Rather its purpose was to state a commitment, a purpose, a goal." 55 Ill. 2d 94, 100.

In view of the holding of *Blase* that article X, section 1, imposed no specific duty on the General Assembly and the strong presumption of constitutionality which must be overcome to invalidate the statute before us, we hold that the Act is not violative of article X, section 1, of the 1970 Constitution. The measures taken to alleviate the crisis facing Chicago schools are properly left to the wisdom of the General Assembly. *Cronin v. Lindberg* (1976), 66 Ill. 2d 47.

Petitioners contend next that Public Act 81—1221 (sec. 18—8.9(k)) provides on its face for a discriminatory deduction of State aid paid to the Chicago school district. This discrimination, they argue, is compounded by its marked racially discriminatory effect. They argue further that the equal protection clause of the Illinois Constitution of 1970 (Ill. Const. 1970, art. I, sec. 2), read in con-

junction with express constitutional provisions establishing education as a fundamental goal of the State (Ill. Const. 1970, art. X, sec. 1), mandate strict judicial scrutiny of statutes involving disparity in provision of educational services.

Section 18—8.9(k) provides in pertinent part:

> "For a school district operating under the financial supervision of an Authority created under Article 34A, the State aid otherwise payable to that district under this Section, other than State aid attributable to Title—I students, shall be reduced by an amount equal to the budget for the operations of the Authority as certified by the Authority to the State Board of Education, and an amount equal to such reduction shall be paid to the Authority created for such district for its operating expenses in the manner provided in Section 18—11 of this Act. The remainder of State school aid for any such district shall be paid in accordance with Article 34A when that Article provides for a disposition other than that provided by this Article."

We need not and do not further address this contention. Obviously none of the petitioners are members of the class of school pupils against whom it is contended the statute is unreasonably discriminatory, and therefore no parties to the action have standing to question its validity. *Cronin v. Lindberg* (1976), 66 Ill. 2d 47, 56; *Board of Education v. Bakalis* (1973), 54 Ill. 2d 448, 467.

Petitioners contend next that if the Authority is treated as a unit of local government separate from the Chicago School District then "Section 18—8.9(k), as amended by the Act invalidly delegates to the Authority the determination, without standard, of the amount [by] which the appropriation of funds by the Legislature to the Common School Fund *** is to be reduced in connection with the Chicago school district." Petitioners argue that section 18—8.9(k) sets no standards and that the amount payable to the school district is dependent upon "what the Authority happens to budget for its operations and certify to the State Board of Education as its operating expenses."

Consequently, it is argued, the section contravenes article II, section 1, of the 1970 Constitution, pertaining to separation of powers.

In *Hill v. Relyea* (1966), 34 Ill. 2d 552, 555, the court said:

> "There is a distinction between the delegation of true legislative power and the delegation to a subordinate of authority to execute the law. (*Lydy, Inc. v. City of Chicago,* 356 Ill. 230.) The former involves a discretion as to what the law shall be; the latter is merely an authority or discretion as to its execution, to be exercised under and in pursuance of the law. (*People v. Warren,* 11 Ill. 2d 420; *City of Evanston v. Wazau,* 364 Ill. 198; *McDougall v. Lueder,* 389 Ill. 141.) It is an established rule that the General Assembly cannot delegate its general legislative power to determine what the law shall be. However, it may delegate to others the authority to do those things which the legislature might properly do, but cannot do as understandingly or advantageously. (*Board of Education v. Page,* 33 Ill. 2d 372; *People ex rel. Daesch v. Mayor of Belleville,* 22 Ill. 2d 226; *City of Evanston v. Wazau,* 364 Ill. 198.) Absolute criteria whereby every detail necessary in the enforcement of a law is anticipated need not be established by the General Assembly. The constitution merely requires that intelligible standards be set to guide the agency charged with enforcement, (*Memorial Gardens Ass'n, Inc. v. Smith,* 16 Ill. 2d 116; *People v. Warren,* 11 Ill. 2d 420,) and the precision of the permissible standard must necessarily vary according to the nature of the ultimate objective and the problems involved. *Board of Education v. Page,* 33 Ill. 2d 372; *People ex rel. Daesch v. Mayor of Belleville,* 22 Ill. 2d 226."

As demonstrated by the debates on House Bill 1264, the drafters of the provision in question were unable to determine how much to budget for operating the Authority. In its first year of operation, for instance, the Authority would be required to incur large expenses related to the sale of bonds. Such expenses, however, would be expected to decline. In view of this and the unique nature of the undertaking, the inability of the General Assembly to set a precise budget for the Authority is understandable.

Moreover, when the Act is viewed in its entirety, it becomes clear that the Authority's power to incur expenses is not unlimited. Section 34A—201 of the Act provides in part:

"The purposes of the Authority shall be to exercise financial control over the Board, and to furnish financial assistance so that the Board can provide public education within the Board's jurisdiction while permitting the Board to meet its obligations to its creditors and the holders of its notes and bonds. Except as expressly limited by this Article, the Authority shall have all powers necessary to meet its responsibilities and to carry out its purposes and the purposes of this Article, including, but not limited to, the following powers:

* * *

(m) to pay the expenses of its operations; ***."

Thus, the Authority's discretion is limited to incurring expenses "necessary" to discharge its responsibilities under the Act. In view of the difficulty or impossibility of defining more precise standards by which the Authority is to determine its budget and hence the amount ultimately allocable to the school district, we cannot say Public Act 81—1221 constitutes an unlawful delegation of legislative power. See also *Paepcke v. Public Building Com.* (1970), 46 Ill. 2d 330, 345-47; *People ex rel. Stamos v. Public Building Com.* (1968), 40 Ill. 2d 164, 174-76.

Petitioners contend that the Act is invalid because two essential provisions (sections 34—3 and 34A—502(a)) were not passed by a three-fifths vote of the members elected to

each house of the General Assembly. They argue that sections 5(a) and 10 of article IV of the Constitution of 1970 must be read together and that "It is contemplated that a bill 'passed prior to July 1' is one introduced after the convening of the Legislature on the second Wednesday of January of that calendar year." They argue that because the Act had its origin in House Bill 1264 (which was introduced in March of 1979, and was not passed prior to July 1, 1979) when it was passed on January 11, 1980, it passed "after June 30th." They argue that in accordance with the provisions of section 10 of article IV the bill cannot become effective until July 1, 1980, unless it was passed by the vote of three-fifths of the members elected to each house.

Article IV, section 10, of the Constitution of 1970 provides as follows:

> "The General Assembly shall provide by law for a uniform effective date for laws passed prior to July 1 of a calendar year. The General Assembly may provide for a different effective date in any law passed prior to July 1. A bill passed after June 30 shall not become effective prior to July 1 of the next calendar year unless the General Assembly by the vote of three-fifths of the members elected to each house provides for an earlier effective date."

Both the constitutional provision and the legislation enacted in implementation thereof (Ill. Rev. Stat. 1977, ch. 131, pars. 21 through 26) referred to a bill "passed prior to July 1 of a calendar year" without regard to when the bill may have been filed or its prior course through the legislative process. (Ill. Const. 1970, art. IV, sec. 10; Ill. Rev. Stat. 1977, ch. 131, par. 21.) In our opinion this clear and explicit constitutional provision requires no construction, and in accordance with the provision contained in the bill, it became effective upon becoming a law.

Finally petitioners contend that Public Act 81—1221 could not, as required by article IV, section 8, of the Constitution, have been read "on three different days" in

either house for the reason that it is obvious that it came into existence and "traversed the whole legislative process in one day, January 11, 1980." Petitioners argue that House Bill 1264 filed in March 1979 dealt solely with the retirement age of certain school personnel. It was at that time entitled "An Act to amend the School Code." It was read on three different days in the House, passed the House, and was sent to the Senate. In the Senate it received a first reading and was assigned to committee. On January 9, 1980, the bill was discharged from committee and given its second reading in the Senate. On January 11, 1980, everything but the title and the enacting clause was deleted from House Bill 1264 and the contents of what became Public Act 81—1221 were substituted. On that same date House Bill 1264 was given two readings in the Senate, passed the Senate, and was sent to the House, which passed it as received. Subsequently it was approved by the Governor. Petitioners argue that the foregoing procedure "is such a wilful and gross violation of article IV, section 8(d) that no categorization of these actions as being merely 'procedural' and as somehow absolved by the 'enrolled bill' rule seems adequate under the circumstances."

Respondents contend that it was the clear intent of the framers of the Constitution, and our holding in *Fuehrmeyer v. City of Chicago* (1974), 57 Ill. 2d 193, that the argument made now by petitioners be foreclosed. In *Fuehrmeyer* the city of Chicago argued that a house bill was not validly enacted for the reason that it was not read by title in the Senate three times. In addressing that contention the court said:

> "The City of Chicago argues that House Bill 3636 was not validly enacted and hence did not become effective because it was not read by title three times in the Senate. Section 8(d) of article IV of the Constitution provides: 'A bill shall be read by title on three different days in each house.'

The City's contention is based upon excerpts from the transcript of the debates in the Senate which fail to show that House Bill 3636 was read by title, although they do show that the bill was called upon third reading in the Senate, that there was a roll call and that the yeas and nays were taken by record vote. They were entered on the journal as required by the Constitution. Section 7(b) of article IV of the Constitution of 1970 provides: 'Each house shall keep a journal of its proceedings and a transcript of its debates. The journal shall be published and the transcript shall be available to the public.' We think that this contention of the City is answered by the subsequent provision of section 8(d) of article IV which states: 'The Speaker of the House of Representatives and the President of the Senate shall sign each bill that passes both houses to certify that the procedural requirements for passage have been met.' Whether or not a bill has been read by title, as the Constitution commands, seems fairly to be characterized as a procedural matter, the determination of which was deliberately left to the presiding officers of the two Houses of the General Assembly." 57 Ill. 2d 193, 198.

In *Benjamin v. Devon Bank* (1977), 68 Ill. 2d 142, the court recognized the validity of the enrolled-bill rule insofar as it related to procedural requirements for passage of legislation. The court said:

"The so-called 'certification' or 'enrolled bill' rule, contained in the last sentence of article IV, section 8(d), provides: 'The Speaker of the House of Representatives and the President of the Senate shall sign each bill that passes both houses to certify that the procedural requirements for passage have been met.'

The Committee on the Legislature of the constitutional convention explained the purpose of this provision as follows:

> '3. Journal Entry and Enrolled Bill Rules—Presently Illinois has the "journal entry" rule as distinguished from an "enrolled bill" rule. It is proposed that Illinois adopt the "enrolled bill" rule.
>
> The "journal entry" rule means that a piece of legislation can be challenged in the courts by pointing to a defect in its passage as reflected in the journal. Under this rule, a statute duely [*sic*] passed by the General Assembly and signed by the Governor may be attacked in the courts, not necessarily on its merits, but on some procedural error or technicality found in the legislative process. The "journal entry" rule, as a result, leads to complex lititation over procedures and technicalities.
>
> The "enrolled bill" rule would provide that when the presiding officers of the two houses sign a bill, their signatures become conclusive proof that all constitutional procedures have been properly followed. The "enrolled bill" rule would not permit a challenge to a bill on procedural or technical grounds regarding the manner of passage if the bill showed on its face that it was properly passed. Signatures by the presiding officers would, of course, constitute proof that proper procedures were followed.
>
> For a thorough discussion of the Constitutional and legal problems associated with the existing "journal entry" rule, see: Braden and Cohn, *The Illinois Constitution* pp. 153-154, 157-158 and 159-160.
>
> The method recommended for adopting the "enrolled bill" rule is to add the following phrase to the third paragraph of section 8 c [now section 8(d)] : "to certify that the procedural requirements for passage have been met." ' 6 Proceedings 1386-87." 68 Ill. 2d 142, 145-46.

This case is distinguishable from *Benjamin* in that the alleged defect argued by petitioners would require examination of the Journal, whereas in *Benjamin*, failure to comply with the constitutional provision was apparent from

the face of the bill. The enrolled bill rule is clearly applicable here, and we hold the legislation was properly enacted.

For the reasons stated we hold that Public Act 81–1221 is constitutional and became effective upon approval on January 16, 1980.

*Judgment for defendants.*

MR. JUSTICE MORAN, dissenting:

This court may issue a declaratory judgment only if an actual controversy exists. (*Underground Contractors Association v. City of Chicago* (1977), 66 Ill. 2d 371, 375; *Dean Milk Co. v. City of Aurora* (1949), 404 Ill. 331, 334.) It cannot issue an advisory opinion based on the possibility of future harm or injury. (*Exchange National Bank v. County of Cook* (1955), 6 Ill. 2d 419, 422; *Dee-El Garage, Inc. v. Korzen* (1972), 53 Ill. 2d 1, 11.) In the case before us, the majority admits that there is no actual controversy but fails to explain why such deficiency does not act to prevent the court from taking original jurisdiction. The plaintiffs only "fear" that the obligations due them may be impaired by the School Finance Authority Act (Pub. Act 81–1221). To address those "fears" would be to merely render an advisory opinion. It is only when those fears become a reality that a declaratory judgment may properly be brought.