JAMES CLAYTON *et al.*, Plaintiffs-Appellants, *v.* THE VILLAGE OF OAK PARK, Defendant-Appellee.

First District (2nd Division)   No. 82—2168

Opinion filed August 30, 1983.

Thomas W. McNamara and Eugene R. Wedoff, both of Chicago (Jenner & Block, of counsel), for appellants.

Arthur C. Thorpe, of Chicago (Klein, Thorpe & Jenkins, Ltd., of counsel), for appellee.

JUSTICE HARTMAN delivered the opinion of the court:

The intended purpose of the ordinance challenged here is "to insure the single-family residences in the village of Oak Park against the possibility of economic loss, and thereby help to eliminate irratio-

nal fears of racial change," and to assure owners that their properties will not deteriorate in value as a result of projected racial changes in the community. A declaratory judgment action was brought by certain owners of nonqualifying properties within the village attacking the validity of the ordinance. The respective parties filed cross-motions for judgment on the pleadings. Judgment was entered for the village from which plaintiffs appeal.

The principal issues presented for review include whether: the ordinance places the village of Oak Park in the business of insurance, in violation of the Illinois Insurance Code; and, the ordinance is invalid for violating one or more of several constitutional provisions identified by plaintiffs.

We affirm for the reasons which follow.

The village notes in its brief, without contradiction, that "racial change is not an academic problem in Oak Park" and that it is surrounded by areas which are totally segregated, involving both wholly white and wholly black populations. Since its adoption of a fair housing ordinance 14 years ago, the village has endeavored to be a racially integrated community and has utilized its home rule powers since 1970 to combat "steering, blockbusting, segregation, and the attendant evil of blighted housing."

The ordinance before us in this appeal is entitled "Ordinance Providing for an Equity Assurance Plan for Single Family Residences in the Village of Oak Park." It creates an Equity Assurance Program (Program) administered by a nine-member commission appointed by the village president. Generally, the Program allows each owner who occupies his single-family residence in the village to apply by submitting a fee, now set at $90,[1] upon receipt of which the residence is appraised by a commission-approved appraiser. When the appraisal is completed, the commission issues a certificate of participation to the homeowner showing, among other things, his membership in the Program and the home's appraised valuation.

Through the Program, after a five-year waiting period, the village will reimburse a participating owner 80% of the difference between the appraised value of the home at time of certification and the value at the time of sale if there has been a diminution in value. The Program is not intended to "insure against a regional or national decline in values" of homes. Accordingly, in the event of general economic decline in the value of homes in the Cook County metropolitan area, the "President and Board of Trustees of the Village of Oak Park reserve

---

[1]The fee is based primarily upon costs of an appraisal.

the right to review, revise and suspend payments" under the Program.

## I

■ Plaintiffs first contend that the ordinance is void because it places Oak Park in the insurance business without proper registration, in violation of section 121(1) of the Illinois Insurance Code (Code) (Ill. Rev. Stat. 1981, ch. 73, par. 733(1)), which provides: "It shall be unlawful for any *company* to enter into a contract of insurance as an insurer or to transact *insurance business* in this State, without a certificate of authority from the Director." (Emphasis added.) Plaintiffs insist that the word "company" embraces municipal entities such as Oak Park. In section 2 of the Code, "company" is defined to include "*** [an] individual or aggregation of individuals engaging in or proposing or attempting to engage in any kind of insurance or surety business ***." (Ill. Rev. Stat. 1981, ch. 73, par. 614(e).) Plaintiffs maintain further that absent a certificate of authority, the activities stemming from the Program constitute the unauthorized transaction of insurance business.

The term "company" under the regulatory provisions of the Code contemplates an entity engaged or attempting to engage in an "insurance or surety business." (Ill. Rev. Stat. 1981, ch. 73, par. 614(e); see Ill. Rev. Stat. 1981, ch. 73, pars. 733(1), 733—3.) The phrase "insurance business" is not defined in the Code, but it cannot be construed as identical to "insurance"; otherwise, the word "business" would be without effect. (See *People v. Lutz* (1978), 73 Ill. 2d 204, 212, 383 N.E.2d 171.) The legislature must be presumed to have deliberately added the word "business" (*State ex rel. Farmer v. Monsanto Co.* (Mo. 1974), 517 S.W.2d 129, 132), and that the term is to be used in its ordinary sense. (*City of East Peoria v. Group Five Development Co.* (1981), 87 Ill. 2d 42, 46, 429 N.E.2d 492.) The word "business" has been defined as " 'any particular occupation or employment, habitually engaged in, especially for livelihood or gain.' " (*Svithiod Singing Club v. McKibbin* (1942), 381 Ill. 194, 199, 44 N.E.2d 904.) An insurance company is an ordinary business corporation whose policies are obtained for ordinary business purposes. (*Peterson v. Manhattan Life Insurance Co.* (1910), 244 Ill. 329, 91 N.E. 466.) An insurance business transaction anticipates payment by the assured of a consideration proportionate to the insurer's risk of having to pay the potential loss. *Vredenburgh v. Physicians Defense Co.* (1906), 126 Ill. App. 509, 511.

The Program here cannot be said to have been established as an

"occupation" for "livelihood or gain" for the village. The nominal, one-time $90 fee charged to participating homeowners principally covers the expense of appraising the premises; it bears no proportionality to the extent of the risk covered. The cost of the Program is mainly borne by the village as a whole rather than by the applicants. These features of the Program thus are significantly distinguishable from the business venture of selling repurchase contracts involved in *Commonwealth ex rel. Schnader v. Fidelity Land Value Assurance Co.* (1933), 312 Pa. 425, 167 A. 300. The ordinance and its Program here focus upon a governmental purpose and do not place the village in the insurance business.

In 1971, article VIII½ (Ill. Rev. Stat. 1981, ch. 73, pars. 743.1 *et seq.*) was added to the Code, which relates to insurance holding company systems. It includes a special definition of "company" under section 131.1(d), which has "the same meaning as 'company' as defined in section 2 of this Code, except that it does not include agencies, authorities or instrumentalities of *** a State or political subdivision of a State." (Ill. Rev. Stat. 1981, ch. 73, par. 743.1(d).) The express exclusion from this special definition of political subdivisions of a State and the absence of such an exclusion in section 2 of the Code lead plaintiffs to conclude that the general definition contained in section 2 must be read to include political subdivisions within its terms. Plaintiffs overlook the broad home rule powers enjoyed by municipal entities, such as Oak Park, under article VII, section 6(a) of the 1970 Illinois Constitution, to "*** exercise any power and perform any function pertaining to its government and affairs ***." The omission of such an exclusion from the general definition in section 2 of the Code, written in 1937, cannot be construed to deny this fundamental grant of power by the 1970 Illinois Constitution. Involvement by home rule units in various forms of insurance programs pertaining to their government and affairs has been upheld in other jurisdictions as well. See, *e.g., Butterworth v. Boyd* (1938), 12 Cal. 2d 140, 82 P.2d 434; *City of Wichita v. Wyman* (1944), 158 Kan. 709, 150 P.2d 154.

Further, the intergovernmental cooperation provisions of the constitution authorize home rule entities to contract and otherwise associate with other public agencies or private corporations in any manner not prohibited by law. (Ill. Const. 1970, art. VII, sec. 10(a).) Section 6 of the Intergovernmental Cooperation Act (Ill. Rev. Stat. 1981, ch. 127, par. 746) allows governmental units to contract for joint self insurance and further liability or loss protection in such areas as may need insurance protection. When the foregoing provisions are read together with the definition of an insurance holding company system

(Ill. Rev. Stat. 1981, ch. 73, par. 743.1(c)), "two or more affiliated persons, one or more of which is an insurance company as defined ***" in section 2, section 131.1(d) simply makes clear that even if a home rule entity is associated with other agencies or corporations in an insurance holding company system, it is nevertheless exempted from Code regulations. The absence of an express exclusion of political subdivisions from the section 2 definition, therefore, is further explained and is of no consequence to the issues here presented.

■ Finally, the rights of the sovereign are not impaired by a general legislative enactment governing private rights unless the enactment expressly makes the sovereign accountable. (*Department of Revenue v. Appellate Court* (1977), 67 Ill. 2d 392, 396, 367 N.E.2d 1302; *Division of Old Age Assistance v. Lyman* (1939), 373 Ill. 27, 30, 25 N.E.2d 49.) Since neither the State nor its municipalities or subdivisions are overtly mentioned in section 2, the Code does not regulate local governmental activities.

Much of plaintiffs' brief focuses on whether the contracts arising from the Program constitute insurance contracts. The issue, however, is not whether the agreements are valid insurance contracts, but whether the Equity Assurance Program comprises an insurance business. We hold that it does not for the aforestated reasons.

## II

■ Only owner-occupants of single-family residences are eligible for the benefits bestowed by the ordinance. Plaintiffs contend that this qualification violates the equal protection guarantees of both the Federal and Illinois constitutions, since it irrationally discriminates in favor of owner-occupants of single-family residences and against other property owners. Differences in classification between single-family and other residential uses have been sustained for many years. (See, e.g., *Bennett v. City of Chicago* (1962), 24 Ill. 2d 270, 181 N.E.2d 96; *Illinois Housing Development Authority v. Van Meter* (1980), 82 Ill. 2d 116, 412 N.E.2d 151; *In re Application of Korzen* (1978), 63 Ill. App. 3d 835, 380 N.E.2d 852.) The village asserts that the Program is reasonably related to its interest in preventing "blockbusting" or "panic peddling"[2] by the "high pressure" sales techniques of certain

---

[2]"That device, whereby owners are induced to part with their property by implanting or inflaming fears that property values will diminish because Negroes are, or may become residents *** is a technique used by some real-estate brokers to perpetuate segregated housing." *Chicago Real Estate Board v. City of Chicago* (1967), 36 Ill. 2d 530, 553, 224 N.E.2d 793.

unsavory real estate brokers[3] traditionally targeting owner-occupied single-family residences. It maintains that condominium owners, through their associations, and owners of income producing properties, are generally more sophisticated and can more effectively combat blockbusters than individual homeowners. The village further asserts that owners of commercial property are less susceptible than homeowners to the approaches of panic peddlers.[4] Plaintiffs respond that while the purpose of the ordinance is legitimate, there is no relationship between blockbusting and identifying single-family residences for protection.

The burden of establishing an enactment's unconstitutionality is on the challenging party. (*Polyvend, Inc. v. Puckorius* (1979), 77 Ill. 2d 287, 303, 395 N.E.2d 1376.) Legislation which does not create a suspect classification or infringe upon a fundamental right, but rather involves economic and social welfare policy, will be upheld against equal protection challenges if it is rationally related to the achievement of a legitimate State interest. (*Illinois Housing Development Authority v. Van Meter* (1980), 82 Ill. 2d 116, 119-22.) Whether the course chosen by the legislature to achieve a desired objective is the best means available is not subject to judicial inquiry. *Garcia v. Tully* (1978), 72 Ill. 2d 1, 10, 377 N.E.2d 10.

Plaintiffs have not sustained their burden of showing that the classification is unrelated to a legitimate governmental interest. A statutory scheme will be upheld if any statement of facts can be reasonably conceived to justify it. (*Salyer Land Co. v. Tulare Water District* (1973), 410 U.S. 719, 732, 35 L. Ed. 2d 659, 668, 93 S. Ct. 1224, 1231; *McGowan v. Maryland* (1961), 336 U.S. 420, 426, 6 L. Ed. 2d 393, 399, 81 S. Ct. 1101, 1105; *Illinois Housing Development Authority v. Van Meter* (1980), 82 Ill. 2d 116, 122.) The village reasonably could have found that owner-occupants of single-family residences were generally more prone to blockbusting schemes than other property owners. It was not obligated to support the ordinance's validity by pointing to a report or study in support thereof. (See *Jones v. United States* (1983), 463 U.S. \_\_\_, 77 L. Ed. 2d 694, 103 S. Ct.

---

[3]See Note, *Blockbusting: A Novel Statutory Approach to an Increasingly Serious Problem*, 7 Colum. J. L. & Soc. Prob. 538 (1971); Note, *Blockbusting* 59 Geo. L. J. 170 (1970); Comment, *Blockbusting: Judicial and Legislative Response to Real Estate Dealers' Excesses*, 22 De Paul L. Rev. 818 (1973).

[4]Oak Park has recognized problems of multiple family dwelling owners in racially changing areas by providing for the issuance of $3,000,000 in housing bonds for making low interest mortgages to such property owners to insure maintenance of this type of housing in the village.

3043.) The village is not constitutionally required to extend the benefits of the Program to all property owners within its borders; it "could direct its attention to the aspect of the problem it deemed most acute." (*Chicago Real Estate Board v. City of Chicago* (1967), 36 Ill. 2d 530, 549, 224 N.E.2d 793.) The purpose of the ordinance, to promote racial integration by eradicating panic peddling, is highly commendable. While innovative and untried, the means chosen to achieve this laudable objective are sufficiently related to a legitimate governmental interest to withstand scrutiny under the equal protection clause.

Plaintiffs also assert that the Program violates the Illinois constitutional prohibition against special legislation. (Ill. Const. 1970, art. IV, sec. 13.) Courts considering special legislation challenges employ the same test used in equal protection challenges, namely, whether the classification bears a rational relationship to a valid purpose. (*Wilson v. All-Steel, Inc.* (1981), 87 Ill. 2d 28, 35, 428 N.E.2d 489.) As demonstrated above, the Program's classifications are related to important governmental interests, and are therefore constitutional.

III

■ Plaintiffs claim that the program violates the constitutional mandate that public funds, property or credit be used solely for public purposes (Ill. Const. 1970, art. VIII, sec. 1(a)), by allowing the use of public funds to compensate participating homeowners for their individual real estate investment losses. We disagree. Whether a proposed expenditure serves public purposes is a determination initially made by the legislative body empowered to expend the resources. (*Hagler v. Small* (1923), 307 Ill. 460, 474-75, 138 N.E. 849; *Marshall Field & Co. v. Village of South Barrington* (1981), 92 Ill. App. 3d 360, 366, 415 N.E.2d 1277.) Broad discretion is allowed in such matters. (*People ex rel. City of Salem v. McMackin* (1972), 53 Ill. 2d 347, 355, 291 N.E.2d 807.) There is no constitutional prohibition against the use of public funds which inure to the benefit of private interests, provided that the money is employed for a public purpose. (*People ex rel. City of Urbana v. Paley* (1977), 68 Ill. 2d 62, 75-76, 368 N.E.2d 915.) Although a self-serving recitation that public purposes are served is not conclusive of that question, the consensus of modern judicial thought is to broaden the scope of the activities that may be classified as involving a public purpose. *Marshall Field & Co. v. Village of South Barrington* (1981), 92 Ill. App. 3d 360, 366; *People ex rel. City of Salem v. McMackin* (1972), 53 Ill. 2d 347, 356.

The potential use of village funds under the Program here to com-

pensate homeowners under specified circumstances serves a public purpose of singular importance: to enhance racial integration through the prevention of panic peddling and blockbusting. (See *People v. Betts Realtors, Inc.* (1977), 66 Ill. 2d 144, 149, 361 N.E.2d 581; *Chicago Real Estate Board v. City of Chicago.*) The benefit obtained by private homeowners is merely incidental thereto. See *People ex rel. City of Canton v. Crouch* (1980), 79 Ill. 2d 356, 368-69, 403 N.E.2d 242.

### IV

■ It is next asserted by plaintiffs that the ordinance is invalid because it exceeds the village's home rule power. They state that the problems of "white flight" and urban racial distribution to which the Program is addressed extend beyond the boundaries of the village. They do not argue, however, that the State already has exercised exclusive powers in this regard (Ill. Const. 1970, art. VII, sec. 6(h)), nor do they argue that this is an area demanding exclusive statewide control.

The fundamental grant of home rule power contained in section 6, article VII, of the 1970 Illinois Constitution is broad and contemplates considerable flexibility. That section permits a home rule unit such as Oak Park to "regulate for the protection of the public health, safety, morals and welfare." Home rule units "have the same powers as the sovereign except where such powers are limited by the General Assembly." (*City of Urbana v. Houser* (1977), 67 Ill. 2d 268, 273, 367 N.E.2d 692.) Article VII requires that home rule powers be construed liberally. Ill. Const. 1970, art. VII, sec. 6(m).

Whether an ordinance has extraterritorial effect in excess of home rule powers must be analyzed by centering upon the subject being regulated. (*City of Evanston v. Create, Inc.* (1981), 85 Ill. 2d 101, 116, 421 N.E.2d 196; see *Commercial National Bank v. City of Chicago* (1981), 89 Ill. 2d 45, 78, 432 N.E.2d 227.) Here, the enactment affects only owner-occupied single-family residences within the borders of the village. The twin evils of blockbusting and white flight may well extend beyond Oak Park's boundaries; yet, the ordinance does not purport to regulate or combat those problems as they pertain to other units of local government—only those which affect the owners of homes who live inside the village. See *City of Evanston v. Create, Inc.* (1981), 85 Ill. 2d 101, 116; *City of Carbondale v. Eckert* (1979), 76 Ill. App. 3d 881, 395 N.E.2d 607.

Plaintiffs' reliance on *City of Des Plaines v. Chicago & North Western Ry. Co.* (1976), 65 Ill. 2d 1, 357 N.E.2d 433, is of little aid. There, the supreme court held that Des Plaines could not adopt a

noise pollution ordinance inconsistent with the Illinois Environmental Protection Act. Plaintiffs here make no claim to the effect that the provisions of the Program conflict with provisions of the Code. (65 Ill. 2d 1, 7.) We conclude that the ordinance embodies a proper exercise of home rule power.

## V

■ The next constitutional infirmity identified by plaintiffs is that the Program delegates to the commission legislative authority without providing adequate guidelines by which it is to be exercised. The Program provides that if a participating homeowner is unable to sell the residence at its previously appraised value within 90 days of placing it on the market, he is to submit all bids received on the residence during the next 30 days to the commission. The commission then has several options: it can approve a bid, thereby requiring the homeowners to accept the bid and obligating the village to pay 80% of the difference between the bid and the previously appraised value of the residence; it can reject a bid, requiring the owner to continue to show the residence to prospective buyers until termination of the 30-day period; or, it can purchase the residence at the offered purchase price, plus 80% of the balance remaining on the residence's appraised value. If the residence is not sold at the end of the 30-day period, within 120 days of its being placed on the market, the commission is required to purchase the residence at the highest price offered, plus 80% of the difference between the purchase price and the appraised value. Because this feature of the Program provides no guidance as to which option should be chosen by the commission, plaintiffs claim, it exceeds constitutionally permissible delegation of power.

Absolute criteria, whereby every detail in the enforcement of an ordinance must be set forth, is not necessary to a valid delegation of power to an administrative agency. (*Polich v. Chicago School Finance Authority* (1980), 79 Ill. 2d 188, 206, 402 N.E.2d 247.) The constitution requires only that intelligible standards be set to guide the agency charged with enforcement, and the precision of the standard may be sufficiently flexible so as to be consonant with the nature of the ultimate objective and the problems involved. *Polyvend, Inc. v. Puckorius* (1979), 77 Ill. 2d 287, 300, 395 N.E.2d 1376.

The village's interest in reducing its potential financial exposure under the Program is self-evident; it is beyond cavil that the discretion challenged by plaintiffs was incorporated into the ordinance in an effort to minimize that financial liability. The flexibility transferred to the commission permits it to determine which option among those ex-

pressly articulated would most likely reduce the monetary exposure of the village. In the final analysis, the contractual agreements necessary to administer the Program must be approved by the village president and board of trustees. The discretion afforded the commission therefore is of much more restricted scope than that contained in many other delegations found valid on review in Illinois. (See, *e.g., Polich v. Chicago School Finance Authority* (1980), 79 Ill. 2d 188, 402 N.E.2d 247 (delegation to financing authority to determine amount ultimately allocable to school district); *Hill v. Relyea* (1966), 34 Ill. 2d 552, 216 N.E.2d 795 (delegation to official to discharge mentally retarded persons from hospital); see generally also 1 K. Davis, Administrative Law Treatise secs. 3:1 through 3:18 (2d ed. 1978).) The municipal authority transferred to the commission here does not constitute an unlawful delegation by the village.

## ·VI

■ Finally, plaintiffs contend that the ordinance is void because it unconstitutionally allows the village to impair contracts entered into under its terms. (Ill. Const. 1970, art. I, sec. 16.) The right of the village to review, revise and suspend payments under the Program is not an impairment of the homeowner's contract with the village; rather, it is part and parcel of the agreement by which the homeowner elects to be bound. The Program was not intended to provide reimbursement to owners for losses attributable to a general decline in market values in the Cook County area, as expressly set forth in the ordinance. Such an economic decline can be ascertained factually in light of the computerized records kept by the Cook County Assessor of the sale price of every house sold in the county. Contracts executed subject to the Program protect owners against losses in equity subject to this express limitation. No impairment of contract exists under this procedure.

For the reasons set forth above, the judgment of the circuit court is affirmed.

Affirmed.

STAMOS and PERLIN, JJ., concur.