(No. 83223 & 83241.—
(No. 83312.—
(No. 83404—

CINCINNATI INSURANCE COMPANY *et al.*, Movants, v. HONORABLE CHARLES W. CHAPMAN, Justice of the Appellate Court, Fifth District, *et al.*, Respondents.—ILLINOIS CENTRAL RAILROAD COMPANY, Movant, v. HONORABLE CHARLES W. CHAPMAN, Justice of the Appellate Court, Fifth District, *et al.*, Respondents.— LINDA UTSLER, Movant, v. JUSTICES OF THE APPELLATE COURT, FIFTH DISTRICT, *et al.*, Respondents.—THE ILLINOIS STATE BAR ASSOCIATION *et al.*, Appellees, v. MIKE MATHIS, Circuit Clerk of Macoupin County, *et al.*, Appellants.

*Announced November 17, 1997.—Opinion filed February 3, 1998.*

NICKELS, J., dissents.

Stephen L. Corn, Gregory C. Ray and John L. Barger, of Craig & Craig, of Mattoon, for movant Cincinnati Insurance Co.

Jennifer A. Hochstrasser and Daniel J. O'Connell, of Daniel J. O'Connell & Associates, P.C., of Elgin, for respondents Warren F. Jesek *et al.*

Richard F. Record, Jr., and Robert G. Grierson, of Craig & Craig, of Mattoon, for movant Illinois Central Railroad Co.

Michael J. O'Rourke, Kelly McCloskey and Roseanne Loftus, of O'Rourke, McCloskey & Moody, of Chicago, for respondent Mary E. Labree.

H. Kent Heller and David Stevens, of Heller, Holmes & Associates, P.C., of Mattoon, for movant Linda Utsler.

Stephen L. Corn, Gregory C. Ray and John L.

Barger, of Craig & Craig, of Mattoon, for respondents Patrick Pitzel and Bennett Grain Co.

Bruce Stratton and William F. Moran III, Special Assistant Attorneys General, of Stratton, Stone, Kopec & Sturm, of Springfield, for appellant Darryl Pratscher.

Donald M. Craven, of Craven & Thornton, P.C., and Dennis A. Rendleman, all of Springfield (Todd A. Smith and Mary Lee Leahy, both of Springfield, and William R. Quinlan and James R. Carroll, of Quinlan & Crisham, Ltd., of Chicago, of counsel), for appellees.

Steven F. Pflaum and Jerome B. Meites, of McDermott, Will & Emery, and Kevin M. Forde, all of Chicago, for *amicus curiae* Chicago Bar Association.

CHIEF JUSTICE FREEMAN delivered the opinion of the court:

The question presented for our review in these consolidated appeals is whether the Judicial Redistricting Act of 1997 comports with the mandates of the Illinois Constitution. For the reasons that follow, we hold that it does not.

## BACKGROUND

### The Redistricting Act of 1997

The 89th Illinois General Assembly passed Public Act 89—719 on January 7, 1997, and the Governor signed it into law on March 7, 1997. The legislation, which is referred to as the Judicial Redistricting Act of 1997 (the Act), took effect immediately upon its signing and repealed the Judicial Districts Act (705 ILCS 21/90

(West 1996)). See Pub. Act 89—719, §§ 90, 99, eff. March 7, 1997. The Act geographically restructures all five judicial districts throughout the State of Illinois for the purpose of electing supreme and appellate court judges. Specifically, section 5 of the Act states that "[t]he First Judicial District shall consist of Cook County and shall be comprised of Supreme Court Judicial Districts 1A, 1B, and 1C." Pub. Act 89—719, § 5, eff. March 7, 1997. Sections 10, 15, and 20 identify the townships within Cook County that shall comprise Districts 1A, 1B, and 1C. Pub. Act 89—719, §§ 10, 15, 20, eff. March 7, 1997. The Act also changes the boundaries of the remaining four judicial districts. To that end, sections 25, 30, 35, and 40 identify the various counties that shall comprise the Second, Third, Fourth, and Fifth Judicial Districts. Pub. Act 89—719, §§ 25, 30, 35, 40, eff. March 7, 1997. Section 45 states that "[a]ll judicial districts created by this Act for the purpose of electing judges shall not be altered by operation of any other statute, ordinance, or resolution." Pub. Act 89—719, § 45, eff. March 7, 1997. Section 50 of the Act contains the implementation schedule for each of the newly created seven supreme court districts. Pub. Act 89—719, § 50, eff. March 7, 1997. Due to the creation of the new boundaries for the judicial districts, the Act also amends the Appellate Court Act (705 ILCS 25/1 (West 1996)) with respect to the election and retention of the appellate judges affected by the new boundaries created for judicial districts two through five. Pub. Act 89—719, § 95, eff. March 7, 1997. The Act further contains a severability clause (Pub. Act 89—719, § 55, eff. March 7, 1997) and certain amendments to the Election Code which require judicial elections to fill vacancies in the office of supreme court judge. Pub. Act 89—719, § 85, eff. March 7, 1997. The amendments provide that the Governor shall issue writs of election when vacancies occur on the supreme court.

### The Cook County Litigation

On March 10, 1997, the Chicago Bar Association and the Illinois State Bar Association filed two lawsuits in the circuit court of Cook County against the Secretary of State and the State Board of Elections, seeking to enjoin implementation of the Act on the basis of its unconstitutionality. The circuit court ultimately ruled that the Act was unconstitutional in its entirety. Chicago Bar Ass'n v. Boyle, Nos. 97—CH—2903, 97—CH—2904 cons. (Cir. Ct. Cook Co. March 31, 1997). Specifically, the court found that the Act contravened the constitutional prohibition against the subdivision of the First Judicial District and that these unconstitutional provisions could not be severed from the remainder of the Act. In addition, the circuit court ruled that even if the unconstitutional provisions could be severed from the remainder of the Act, the redistricting of judicial districts two through five was constitutionally infirm due to the fact that the legislature drew boundaries which impermissibly divided several judicial circuits. Furthermore, the court agreed with the plaintiffs' contention that the Act's special election provisions violated article VI, section 10, of the 1970 Constitution, which mandates that the term of office for a supreme and appellate court judge be 10 years. The court also found that the General Assembly did not comport with the requirement of article IV, section 8(d), that a bill be read by title on three different days in each house. The circuit court's ruling was never appealed.

### Effect of the Boyle Ruling

On April 7, 1997, the Fourth District of our appellate court took notice of the circuit court's ruling in the Boyle case and ordered that appeals within the district should be processed according to the law as it existed prior to the Act's effective date. See *People v. Dainty*,

No. 4—97—0221 (4th Dist. April 7, 1997) (unpublished order). As a result, the appellate court transferred the appeal—which had been docketed according to the redistricting mandated by the Act—back to the appellate district in which it would previously have been docketed. Although the appellate court acknowledged that it was not bound by the circuit court's ruling in Boyle, it recognized that a certain degree of uncertainty and confusion currently existed with respect to the proper constitutional venue for appeals in this state.

This court thereafter entered an administrative order in *Dainty* in which we (i) vacated the appellate court's order and (ii) directed it to reinstate Dainty's appeal. We further found that the "decision of the circuit court in Boyle is binding only on the parties thereto, as law of the case, and is not binding on the Supreme, Appellate, or Circuit Courts of Illinois." We therefore ordered that the Fourth District "shall receive, docket, and process all appeals coming to it from those counties within its appellate jurisdiction as defined by the Judicial Redistricting Act of 1997." Although both the Boyle ruling and the *Dainty* order are not before this court today, both cases played key roles in the causes consolidated for our review today.

### The Current Litigation

The effect of the administrative order entered by this court in *Dainty* is at issue in Docket Nos. 83223, 83241, and 83312, all of which are original actions in this court for supervisory orders. We briefly set out the facts pertinent to each motion.

In Docket No. 83223, movant Cincinnati Insurance Company (Cincinnati) filed an appeal from a judgment of the sixth judicial circuit, Macon County, with the clerk of the appellate court for the Fourth District. The notice was eventually sent to the clerk of the Fifth District of the appellate court in accordance with the

Act. On April 8, 1997, the appellate court, Fifth District, entered a *per curiam* order transferring the appeal to the Fourth District. Like the Fourth District in *Dainty*, the Fifth District noted that it was not bound by the actions of the circuit court of Cook County in the Boyle litigation, but nevertheless deemed it both appropriate and necessary, as a matter of comity, to recognize and acquiesce in the Boyle ruling. However, the Fifth District vacated its order and reinstated the appeal the next day in accordance with this court's administrative order in *Dainty*. On May 6, 1997, Cincinnati filed a motion for supervisory order in this court, claiming that the Act is unconstitutional. Respondents, Warren F. Jesek, D.D.S., and Warren F. Jesek, D.D.S., Ltd., oppose Cincinnati's motion.

In Docket No. 83241, movant Illinois Central Railroad Company (railroad) filed a motion for a supervisory order concerning the appropriate constitutional venue of a Rule 308 application for leave to appeal which originated in the sixth judicial circuit, Macon County (see 155 Ill. 2d R. 308), an action to which the railroad is a party. The railroad requested that this court find that the Act is unconstitutional and order the appellate court, Fifth District, to transfer the Rule 308 application to the Fourth District. Respondent, Mary E. La-Bree, opposes the railroad's motion in this court.

In Docket No. 83312, movant, Linda Utsler, filed her appeal from the sixth judicial circuit in Moultrie County with the appellate court, Fifth District, pursuant to the Act. The defendants in the case, Patrick Pitzel and Bennett Grain Company, sought to have the appeal docketed in the Fourth District, where it would have been docketed prior to the passage of the Act. Utsler opposed the motion and filed a motion for a supervisory order in this court. She seeks to have this court extend its administrative order in *Dainty* to all appellate districts,

pending a final determination as to the constitutionality of the Act. Respondents, Pitzel and Bennett, oppose Utsler's motion in this court, arguing that the Act is unconstitutional.

Meanwhile, on May 7, 1997, the Illinois State Bar Association (ISBA) filed a complaint in the circuit court in Macoupin County against defendants Darryl Pratscher and Mike Mathis in their respective capacities as clerk of the Fourth District of the appellate court and circuit clerk of Macoupin County. The allegations contained in the ISBA's complaint essentially mirrored those contained in the Boyle complaint filed in Cook County. However, the ISBA also sought a temporary restraining order and filed a motion to certify a class which included all appellate and circuit clerks in Illinois. On May 13, 1997, defendant Pratscher moved to dismiss the action. Defendant Mathis appeared personally and with counsel, but declined to file a responsive pleading. The circuit court denied the motion to dismiss, denied the motion for a temporary restraining order, and granted the motion to certify a class consisting of all appellate and circuit court clerks in Illinois. Both sides ultimately moved for judgment. In finding that the Act was unconstitutional in its entirety, the circuit court expressly adopted the circuit court of Cook County's ruling in the Boyle litigation. The court permanently enjoined defendants and all members of the class from implementing the Act, but stayed the effect of the order for 21 days. Defendant Pratscher appealed to this court. 134 Ill. 2d R. 302. We consolidated his appeal (Docket No. 83404) with the previously discussed actions for supervisory orders on June 26, 1997. Moreover, during the pendency of this appeal, we allowed the Chicago Bar Association to file a brief as an *amicus curiae.*

The common question, of course, in each of the causes before us today is whether the various provisions

of the Act comport with our state constitution. Defendant Pratscher, movant Utsler, and the opponents in the remainder of the motions for supervisory orders (hereinafter collectively referred to as defendants) maintain that all sections of the Act are constitutional except those which relate to Cook County. Defendants further argue that the constitutional portions of the Act are severable from the unconstitutional portions. Plaintiff, ISBA, opponent to the motion for supervisory order Patrick Pitzel and Bennett Grain Company, and the remaining movants for supervisory orders, and *amicus* (hereinafter collectively referred to as plaintiffs) argue that the Act is unconstitutional in its entirety and that no portions are severable.

## ANALYSIS

### The Cook County Provisions

As noted above, sections 5, 10, 15, and 20 of the Act create three distinct districts in Cook County for the express purpose of electing supreme court justices. 705 ILCS 21/5, 10, 15, 20 (West 1996). Defendants concede, however, that these provisions run afoul of article VI, section 2, of our state constitution, as previously interpreted by this court. See *People ex rel. Chicago Bar Ass'n v. State Board of Elections*, 136 Ill. 2d 513, 532 (1990). In *State Board of Elections*, this court unanimously held that legislation which subdivided Cook County for the purpose of electing appellate judges was unconstitutional. In so holding, this court noted that prior to the 1962 amendments to the 1870 Constitution, the supreme and appellate courts were treated differently with regard to the way in which judges were elected to each respective court. *State Board of Elections*, 136 Ill. 2d at 530. The 1962 amendment to the judicial article, however, wrought extensive changes to the judiciary and to the way in which appellate court

judges were elected. One of the changes affected the manner in which supreme and appellate court judges were elected—both courts were to share the same five judicial boundaries. *State Board of Elections*, 136 Ill. 2d at 530. The ratification of the 1970 Constitution did not alter any of the changes made in 1962. Indeed, this court noted that during the constitutional convention in 1970, "repeated emphasis" was placed on the fact that the judicial districts and supreme court organization provisions remained unchanged from the 1962 constitutional amendments. *State Board of Elections*, 136 Ill. 2d at 530. Accordingly, we explained that "taken as a whole, the presentation of the Committee of the Judiciary and the resulting dialogue on the convention floor indicate that Cook County was to remain a single, undivided district for the selection of both supreme and appellate judges." For this reason, we concluded that any legislation which subdivided Cook County for purposes of electing *appellate* court judges could not stand. *State Board of Elections*, 136 Ill. 2d at 523.

Although defendants note that the legislation at issue in this case concerns the election of judges to the *supreme* court from Cook County, as opposed to appellate court judges, they concede that this court's analysis in *State Board of Elections* would apply equally to the election of supreme court judges. Given defendants' concession, we see no reason to reexamine the validity of our previous holding with regard to the subdivision of Cook County for the purpose of electing supreme court justices. Accordingly, we affirm the circuit court's finding that the provisions of the Act which impact Cook County are invalid.

### The Reconfiguration of Districts Two through Five

Generally, once this court holds a provision of an act unconstitutional, as we have just done, our inquiry would next focus on whether the invalid portion may be

severed from the remainder of the challenged legisla-
tion—if severance is not possible, the entire legislation
must fall. See, *e.g.*, *State Board of Elections*, 136 Ill. 2d
at 532-33; *City of Chicago Heights v. Public Service Co.*,
408 Ill. 604, 610 (1951). Relying on this precedent,
defendants argue that if the Cook County provisions of
the Act are deemed invalid, the Act's severability clause
renders the remaining provisions in full force and effect.
In this respect, defendants correctly identify section 55
of the Act as a specific severability clause. Section 55
provides the following:

> "To the extent that any provision of this Act is found
> to be unconstitutional, that provision alone shall be
> deemed of no force and effect and all other provisions of
> this Act shall remain in full force and effect." Pub. Act
> 89—719, § 55, eff. March 7, 1998.

We need not, however, address defendants' contentions
regarding the severability of the Cook County provi-
sions because even if we were to agree that those provi-
sions are capable of severance, the Act contains a second
constitutional infirmity which nevertheless renders it
unconstitutional in its entirety. Specifically, the provi-
sions of the Act that redistrict judicial districts two
through five are unconstitutional in that they improp-
erly split several judicial circuits amongst multiple
judicial districts. Moreover, as we explain in greater
detail in the last section of our analysis, the residue of
the Act cannot be severed from all of the invalid provi-
sions without doing violence to the General Assembly's
overall intent in passing the Act.

As noted elsewhere in this opinion, the Act repeals
the Judicial Districts Act and redraws the geographic
boundaries for judicial districts two through five. Al-
though the legislature, in the Act, again divided the
four districts by county, seven judicial circuits are
divided amongst two or more judicial districts. For
example, under the previously existing law, all four of

the counties which comprise the Fourteenth Judicial Circuit were within the Third Judicial District. Under the Act, two of the counties remain in the Third Judicial District, one county is in the Fourth Judicial District, and one county is in the Second Judicial District. Plaintiffs view such redistricting as unconstitutional because a circuit must be contained entirely within a single judicial district. They argue that the plain language of the Constitution clearly establishes that the judicial circuits are the "building blocks" of our state court system. According to plaintiffs, a group of circuits are combined to create an appellate district, and the districts, when combined, encompass the entire state. Defendants, on the other hand, contend that neither the Constitution nor the debates at the Constitutional Convention of 1970 require such a result. They counter that the applicable language in the Constitution is not as clear an indication of the intent as plaintiffs suggest. Rather, defendants view the issue as one "shrouded" in ambiguity and that this court must, therefore, resolve any doubts in favor of the constitutionality of the statute.

This court has long recognized that the meaning of any given constitutional provision depends on the common understanding of the citizens who, by ratifying the Constitution, "gave it life." *Kalodimos v. Village of Morton Grove*, 103 Ill. 2d 483, 492 (1984) (and cases cited therein). We therefore begin our analysis, as we must, by giving effect to the plain language of the Constitution, for it is the language itself which provides the best evidence of what the drafters intended to convey to the citizens for ratification. *Sayles v. Thompson*, 99 Ill. 2d 122, 125 (1983). The following constitutional provisions are particularly relevant to our discussion:

> "The State is divided into five Judicial Districts for the selection of Supreme and Appellate Court Judges. The First Judicial District consists of Cook County. The

remainder of the State shall be divided by law into four Judicial Districts of substantially equal population, each of which shall be compact and composed of contiguous counties." Ill. Const. 1970, art. VI, § 2.

"Appeals from final judgments of a Circuit Court are a matter of right to the Appellate Court in the Judicial District in which the Circuit Court is located." Ill. Const. 1970, art. VI, § 6.

"The State shall be divided into Judicial Circuits consisting of one or more counties. The First Judicial District shall constitute a Judicial Circuit. The Judicial Circuits within the other Judicial Districts shall be as provided by law. Circuits composed of more than one county shall be compact and of contiguous counties. The General Assembly by law may provide for the division of a circuit for the purpose of selection of Circuit Judges and for the selection of Circuit Judges from the circuit at large." Ill. Const. 1970, art. VI, § 7(a).

"Each Judicial Circuit shall have one Circuit Court with such number of Circuit Judges as provided by law." Ill. Const. 1970, art. VI, § 7(b).

We regard the language in the Constitution as a limitation upon the legislature's authority and not as a grant of power. As a result, the General Assembly is free to enact any legislation not expressly prohibited by the Constitution. See *State Board of Elections*, 136 Ill. 2d at 525.

Section 6 of the Constitution provides that appeals from final judgments of a circuit court are a matter of right to the appellate court in the judicial district in which the circuit court is located. Section 7 of the Constitution concerns both circuit courts and judicial circuits. Section 7(a) begins by first dividing the state into judicial circuits, which may be comprised of more than one county. The next two sentences set forth how the judicial circuits shall be composed. The first of these two sentences refers back to the judicial districts established earlier in section 2 and requires that the "First Judicial District" constitute one judicial circuit.

The next sentence permits the legislature to provide by law for the other judicial circuits *within* the judicial districts. Finally, section 7(b) requires each judicial circuit to have "one Circuit Court." Ill. Const. 1970, art. VI, § 7(b). Section 7, therefore, establishes a unified circuit court structure in this state, comprised of judicial circuits resting "within" the judicial districts.

It is the combination of sections 6 and 7 which renders unconstitutional the splitting of a judicial circuit amongst different districts. Section 6 requires that appeals from judgments of the circuit court be heard "in the Judicial District in which the Circuit Court is located." Ill. Const. 1970, art. VI, § 6. However, the Constitution limits each judicial circuit to only one "circuit court," even though a circuit may be comprised of multiple counties, throughout which various circuit courthouses may be situated. In order to comply with the constitutional requirement that appeals from a circuit court must be heard by the appellate court in the judicial district in which the circuit court is located, the entire "judicial circuit" from which the single circuit court is created must likewise be contained wholly within a single judicial district.

Our interpretation of the foregoing constitutional language is buttressed by comments made during the Constitutional Convention of 1970. Although several members of the Judiciary Committee disagreed with the concept of granting the General Assembly the authority to divide circuits for the purpose of the selection of circuit judges (see, *e.g.*, 6 Record of Proceedings, Sixth Illinois Constitutional Convention 1078 (hereinafter Proceedings)), not one member of the Committee dissented from the majority's proposal that

> "[t]he present basic constitutional pattern of judicial circuits remains unchanged. This means that Cook County is defined as a permanent judicial circuit, with the remainder of the state being divided by law *** [and] the

judicial circuits being encompassed *wholly within each of the four Appellate Court Districts outside of Cook County.*" (Emphasis added.) 6 Proceedings 978.

In fact, the intent to keep intact circuits encompassed within a judicial district is evinced by the verbatim transcript of the debate of July 2, 1970. The chairman of the Judiciary Committee, William Fay, stated that

> "the present basic constitutional pattern of judicial circuits remains unchanged. Cook County continues to be defined as a separate permanent judicial circuit, the remainder of the state being divided by law and the judicial circuits consisting of one or more counties *and the judicial circuits being encompassed wholly within each of the four appellate court districts outside of Cook County.*" (Emphasis added.) 3 Proceedings 2278.

Thus, the constitutional debates reinforce the notion that judicial circuits were not to be split amongst various judicial districts.

The insight provided by these comments is critical to our task of discerning the intent of the drafters. As this court has stated in the past, "[t]he meaning which the delegates to the convention attached to a provision in the Constitution *** is relevant in resolving ambiguities which may remain after consulting the language of the provision. [Citations.] The reason is that it is only with the consent of the convention that such provisions are submitted to the voters in the first place." *Kalodimos,* 103 Ill. 2d at 493. Defendants themselves acknowledge the above-cited statements, but dismiss their relevance by characterizing them as mere "fleeting references" to the question at hand. Given defendants' contentions that the issue of whether judicial circuits may be split and put into different judicial districts is one "shrouded" in ambiguity, we find this characterization inexplicable. The statements serve as a clear indication that the language utilized in sections 6 and 7 was intended to prohibit the legislature from splitting the circuits amongst several judicial districts. Sections 25,

30, 35, and 40 of the Act, however, contravene this intent by dividing several judicial circuits. For this reason, therefore, the sections are unconstitutional.

### Severability

We have now held that sections 5, 10, 15, 20, 25, 30, 35, and 40 of the Act are invalid and must next determine whether these invalid sections may be severed from the balance of the Act. Although we acknowledge the severability clause contained in section 55 of the Act, such a clause is not necessarily conclusive as to whether the remainder of the Act can stand. *State Board of Elections*, 136 Ill. 2d at 533; *Commercial National Bank v. City of Chicago*, 89 Ill. 2d 45, 73 (1982); *Village of Oak Lawn v. Marcowitz*, 86 Ill. 2d 406 (1981). A court's authority to eliminate invalid elements of an act and yet sustain its valid provisions derives not from legislative fiat, but rather from the powers inherent in the judiciary. 2 N. Singer, Sutherland on Statutory Construction § 44.08, at 522 (5th ed. 1993). In fact, the practice of holding statutory provisions severable from those that are found to be invalid originated in the judiciary "long before the innovation of separability clauses." 2 N. Singer, Sutherland on Statutory Construction § 44.08, at 521 (5th ed. 1993). Thus, although the use of severability clauses has become a "common legislative drafting practice" in "modern" times, it is "regarded as little more than a mere formality." 2 N. Singer, Sutherland on Statutory Construction § 44.08, at 521 (5th ed. 1993).

Due to the historical background of the severability clause, courts view the clause not as "an 'inexorable command,' " but as an aid to statutory construction. *Commercial National Bank*, 89 Ill. 2d at 74, quoting *Carter v. Carter Coal Co.*, 298 U.S. 238, 80 L. Ed. 1160, 56 S. Ct. 855 (1936). Indeed, this court has long held that the test of severability is whether the valid and in-

valid provisions of the Act are " 'so mutually "connected with and dependent on each other, as conditions, considerations or compensations for each other, as to warrant the belief that the legislature intended them as a whole, and if all could not be carried into effect the legislature would not pass the residue independently ***".' " *Fiorito v. Jones*, 39 Ill. 2d 531, 540-41 (1968), quoting *Winter v. Barrett*, 352 Ill. 441, 475 (1933). See also *Bowes v. Howlett*, 24 Ill. 2d 545, 550 (1962); *Grennan v. Sheldon*, 401 Ill. 351, 360-61 (1948).

In this case, plaintiffs contend that the inclusion of the clause merely establishes a presumption that the legislature intended for an invalid provision to be severable. That presumption, they contend, is overcome in this case upon consideration of the expansive, interrelated purpose of the various provisions contained within the whole of the Act. Defendants disagree and argue that each piece of legislation would have been enacted separately because each focused on different problems inherent to the geographic region which it addresses. For example, the General Assembly subdivided the First Judicial District for the purpose of electing supreme court judges, but promulgated the provisions concerning judicial districts two through five to alleviate the population imbalance which exists in the districts outside of Cook County. Defendants' arguments, however, fall wide of the mark. As we explain below, the General Assembly's purpose in passing Public Act 89—719, as reflected in the debates, was to provide a *total* redistricting package which provided all the citizens of the state with a state supreme court composed in accordance with the mandates of both the United States and Illinois Constitutions.

According to the legislative debates, Senate Bill 825 was originally introduced in March 1995 as "An Act to amend the Judicial Districts Act by changing Section

1." 89th Ill. Gen. Assem., Senate Proceedings, January 7, 1997, at 18 (statement of Senator Demuzio). At the time, section one of the Judicial Districts Act provided that "[t]he First Judicial District consists of the County of Cook." 705 ILCS 20/1 (West 1992). Thus, the sole focal point of the proposed legislation was the First Judicial District. Senate Bill 825, however, was amended in the House, which refused to recede from its amendment. 89th Ill. Gen. Assem., Senate Proceedings, January 7, 1997, at 81. As a result, Senate Bill 825 moved to a joint Senate/House conference committee for consideration. In the words of one of the bill's proponents, the joint Senate/House committee "gutted" the March 1995 version of Senate Bill 825 and "replace[d]" it with what was referred to as the "Joint Senate/House Judicial Redistricting Plan." 89th Ill. Gen. Assem., House Proceedings, January 7, 1997, at 71 (statements of Representative Kubik). In addition to creating boundaries for Supreme Court Districts 1A, 1B, and 1C, the joint committee version of Senate Bill 825 created new boundaries for judicial districts two through five and an implementation schedule for the transition between all existing and proposed boundaries. Among other things, the new version of Senate Bill 825 even contained an order of priority to fill vacancies in the First Judicial District (referencing the new subdivisions) if a vacancy should occur prior to the completion of the implementation schedule and express language which prohibited *any future* alteration of the *seven* districts created in it. See 89th Ill. Gen. Assem., House Proceedings, January 7, 1997, at 70-71 (statements of Representative Kubik).

The foregoing legislative history of Senate Bill 825 demonstrates that, during the joint Senate/House conference, the Senate's original intent to focus only on Cook County for the purpose of electing its three supreme court justices evolved into a complete *statewide*

restructuring of the judiciary for purposes of electing all *seven* members of this court. The change in focus, from the subdivision of the First District to a total statewide reconfiguration of seven new districts, complete with roughly equivalent populations, clearly denotes a unified, "mutually connected" legislative scheme.[1] In fact, the proponents of the legislation stated repeatedly that the impetus for this legislation was to provide Illinois citizens, *statewide,* with a system of electing supreme court justices that comported not only with the Illinois Constitution, but with the equal protection clause of the United States Constitution as well. See 89th Ill. Gen. Assem., House Proceedings, January 7, 1997, at 75-82 (statements of Representative Kubik); 89th Ill. Gen. Assem., Senate Proceedings, January 7, 1997, at 83-87 (statements of Senator Petka). These comments make clear that *all* of the supreme court redistricting provisions (whether redrawing the boundaries of districts two through five or subdividing district one) were enacted in response to a perception that the current system of elect-

---

[1]Representative Kubik stated that Senate Bill 825 was drafted to create supreme court districts of substantially equal population. When asked how the proposed legislation achieved this goal in actual population figures, he responded that "[i]n Judicial District 1A in Cook County, there's a population of 1,701,624 people. In Judicial District 1B in the County of Cook, there's a population of 1,701,541. In Judicial District 1C in Cook County, there is a population of 1,701,902 people. In Judicial District 2, the population of the district is 1,571,602. In Judicial District 3, the population is 1,587,604. In Judicial District 4, the population is 1,573,661. And in Judicial 5, the population is 1,592,688 people." 89th Ill. Gen. Assem., House Proceedings, January 7, 1997, at 81. The fact that a difference of only 130,300 exists between the smallest district and the largest district points not only to the conclusion that these provisions were drafted together as a "whole" package, but were intended to be considered *in toto* as well.

ing supreme court justices was unconstitutional. The final version of Senate Bill 825 which was drafted in the joint Senate/House committee conference can only be viewed as a compromise between the House and the Senate with respect to the overall scope and content of Senate Bill 825. From this we can only conclude that the bill was meant to be passed in its entirety, not in pieces.

In our view, both the legislative history and the debates support plaintiffs' assertion that the presumption of severability created by the insertion of the severability clause in the Act has been rebutted. Our examination of both the House and the Senate proceedings substantiates that the overwhelming intent of the legislature was to reconfigure the *entire* state judiciary with respect to the supreme court in order to rectify certain perceived constitutional irregularities. As such, all of the Act's provisions are "inextricably bound." *Fiorito*, 39 Ill. 2d at 541. Furthermore, we emphasize that, at this juncture, *none* of the provisions remaining in the Act reconfigure or redistrict, in any way, the judicial boundaries of the state. Even in cases where the valid sections of an act are complete and capable of being executed, the entire act will be declared void if, after striking the invalid provisions, the act that remains does not reflect the legislature's purpose in enacting the legislation. See *Best v. Taylor Machine Works*, 179 Ill. 2d 367, 462 (1997) (and cases cited therein). In this case, the legislative purpose in enacting Senate Bill 825 was to redistrict the state judiciary with respect to the supreme court. As we have just noted, the Act as it currently stands, with the invalid portions removed, redistricts nothing. Any attempt by this court to retain only bits and pieces of this dramatic legislation would do violence to the legislative intent to change the judicial districting of the entire state. Accordingly,

because the invalid portions of the Act cannot be severed from the residue, the entire Act must fall.

As a final matter, this court is not unaware of the fact that our state constitution requires the legislature to provide by law for four judicial districts outside of Cook County "of substantially equal population." Ill. Const. 1970, art. VI, § 2. The legislative debates reflect that by enacting Senate Bill 825, the members of the 89th General Assembly attempted to meet their constitutional mandate. Nevertheless, this case marks the second time in 10 years that legislative attempts at redistricting have been declared unconstitutional by this court. See, e.g., State Board of Elections, 136 Ill. 2d 513. In this respect, the comments made by Justice Ryan in his special concurrence in State Board of Elections still resonate today:

> "[T]his court, the legislature and the executive are bound by the limitations of the constitution. No matter how politically or socially desirable a piece of legislation may be, if it is contrary to the provisions of our constitution, it cannot stand. Possibly, this court is more conscious of constitutional restrictions than are the other branches of our State government because we must constantly square our holdings with the constitution, whereas the legislative and executive branches must often measure their positions by social and political concerns. Nonetheless, the final product of those branches must stand the constitutional test." People ex rel. Chicago Bar Ass'n, 136 Ill. 2d at 539 (Ryan, J., specially concurring).

We are compelled, therefore, to reemphasize the importance of insuring that reformatory legislation comport with the limitations imposed by our state constitution.

## CONCLUSION

We hold that the Judicial Redistricting Act of 1997 is void in its entirety. Accordingly, the judgment of the circuit court in Docket No. 83404 is affirmed. With respect to the motions for supervisory orders filed in

Docket Nos. 83223 and 83241, we grant both motions. However, we deny the motion for supervisory order filed in Docket No. 83312. In all three causes, the proper appellate venue is the appellate court, Fourth District.

*Nos. 83223 & 83241—Motions granted.*
*No. 83312—Motion denied.*
*No. 83404—Judgment affirmed.*

JUSTICE NICKELS dissents.