DAVID ORR, as Cook County Clerk and as a Taxpayer, Resident, Future Candidate for Elected Office, and Registered Voter of Cook County, *et al.*, Plaintiffs-Appellants, v. JIM EDGAR, Governor of the State of Illinois, *et al.*, Defendants-Appellees.—CLINT KRISLOV *et al.*, Plaintiffs-Appellants, v. ILLINOIS STATE BOARD OF ELECTIONS, Defendant-Appellee.

First District (6th Division) Nos. 1—98—1485, 1—98—1508 cons.

Opinion filed July 20, 1998.

ZWICK, J., dissenting.

Krislov & Associates, Ltd., of Chicago (Clinton A. Krislov and William Bogot, of counsel), for appellants Clint Krislov and Constance Howard.

Garner, Carton & Douglas (Michael J. Hayes, William J. Quinlan, and Lisa Anne Martin, of counsel), and Hubert & Associates (Donald Hubert, of counsel), both of Chicago, for other appellants.

James E. Ryan, Attorney General (Barbara A. Preiner, Solicitor General, and Jerald S. Post, Assistant Attorney General, of counsel), and Jenner & Block (Anton R. Valukas, Jeffrey D. Colman, Thomas S. O'Neill, and Julie L. Bentz, of counsel), both of Chicago, for appellees.

JUSTICE QUINN delivered the opinion of the court:

On January 7, 1997, the Illinois General Assembly passed Public

Act 89—700 (Act) (Pub. Act 89—700, eff. January 17, 1997) which abolished "one-punch" straight-party voting in Illinois. Governor Edgar signed the Act into law on January 17, 1997. On September 24, 1997, plaintiffs David Orr (Orr) and the Illinois State Council of Senior Citizens' Organizations (Council) filed a complaint for declaratory judgment and injunctive relief alleging that the Act was unconstitutional and that the Act violated the State Mandates Act (30 ILCS 805/1 et seq. (West 1994)). Plaintiff Joseph Ramski later joined the lawsuit and a five-count second amended complaint was filed. Plaintiffs Clint Krislov (Krislov) and Constance Howard also filed a complaint on September 24, 1997, which challenged the constitutionality of the Act. These cases were consolidated in the court below. Plaintiffs Orr, Ramski and the Council (plaintiff Orr) moved for summary judgment on three of their five counts, and plaintiffs Krislov and Howard (plaintiff Krislov) moved for summary judgment on all counts. Defendants Jim Edgar, Ronald D. Michaelson, Hannelore Huisman, Kenneth Boyle, Charles Durham, David Murray, Wanda Rednour and Elaine Roupas responded with a motion to dismiss each of plaintiffs' counts pursuant to sections 2—615 and 2—619 of the Illinois Code of Civil Procedure (Code) (735 ILCS 5/2—615, 619 (West 1994)). On April 24, 1998, the circuit court of Cook County granted defendants' motion to dismiss as to both complaints.

On appeal, these two cases were consolidated. Plaintiff Orr maintains on appeal that: (1) the Act stripped a voting right from the Illinois voters in violation of the Illinois Constitution; (2) the General Assembly violated the constitutional three-fifths majority vote requirement necessary to pass the Act with an immediate effective date; (3) the Act never became law since it was not enacted during the legislative term of the 89th General Assembly; (4) the state legislature violated the three-readings requirement of the Illinois Constitution; and (5) the Act violates the State Mandates Act and plaintiff Orr has standing to challenge this violation. Plaintiff Krislov's issues on appeal mirror issues two through four in plaintiff Orr's brief. In the interest of judicial economy, we will address these common issues together.

For the following reasons, we affirm.

The facts relevant to this appeal are as follows. The 89th General Assembly passed Public Act 89—700 on January 7, 1997, the last day of its legislative term, which ran from January 11, 1995, to January 7, 1997. The Act abolished "one-punch" straight-party voting in Illinois and set forth the various requirements necessary to effectuate its goal. Pub. Act 89—700, §§ 1 through 7, eff. January 17, 1997. The Act began its life in 1995 as House Bill 444, which would have amended

the University of Illinois Trustees Act (110 ILCS 310/1 *et seq.* (West 1994)). Eventually the bill ended up in a conference committee where the committee stripped the bill of its original language and inserted the current language abolishing "one-punch" voting. After a brief floor debate on January 7, 1997, the bill was read one time in both houses and passed along partisan lines that same day. The Act, which had an immediate effective date, received 60 out of a possible 118 votes in the House and 32 out of a possible 59 in the Senate. The 89th General Assembly then adjourned the following day on January 8, 1997, and the Act was sent to Governor Edgar the same day. Governor Edgar signed the Act into law on January 17, 1997.

On September 24, 1997, plaintiff Orr filed his complaint seeking declaratory judgment and injunctive relief. The complaint challenged the substantive and procedural validity of the Act and further alleged that it violated the State Mandates Act (30 ILCS 805/1 et seq. (West 1994)). Plaintiff Orr subsequently filed a second amended complaint on February 24, 1998, which added Ramski as a named plaintiff. Count I of the second amended complaint alleged that the Act violated articles I and III of the Illinois Constitution (Constitution), which require: (1) the State to respect due process, equal protection, and voting rights; (2) elections to be free and equal; and (3) the General Assembly to facilitate voting and to pass election laws that are general and uniform. Count II alleged that the passage of the Act violated article IV, section 10, of the Constitution, which requires bills with an immediate effective date passed after May 31 to receive a three-fifths majority vote in the General Assembly. Count III alleged that the Act violated article IV, section 5(a), of the Constitution (requiring the General Assembly to be a continuous body) and that the late timing of the passage of the Act precluded the Governor and legislature from exercising their amendatory, veto, and veto override powers under article IV, section 9, of the Constitution. Count IV alleged that the passage of the Act violated article IV, section 8(d), of the Constitution, which requires that a bill be read three times in each house of the General Assembly in order to pass. Count V alleged that the Act violated the State Mandates Act (30 ILCS 805/1 et seq. (West 1994)). Count I of plaintiff Krislov's complaint mirrors count II of plaintiff Orr's complaint, count II mirrors count IV of plaintiff Orr's complaint, and count III mirrors count III of plaintiff Orr's complaint. Plaintiffs filed a motion for summary judgment on their common issues.

Defendants responded with a motion to dismiss for a failure to state a claim pursuant to sections 2—615 and 2—619 of the Code (735 ILCS 5/2—615, 619 (West 1994)). Defendants also filed a motion to dismiss the State Mandates Act claim due to plaintiff Orr's lack of

standing. Various other motions also were filed that are not the subject of this appeal. On April 24, 1998, the circuit court, in a 41-page opinion, granted defendants' motions to dismiss and denied plaintiffs' motion for summary judgment. The circuit court dismissed count I of plaintiff Orr's complaint on the grounds that the Act did not interfere with the citizens' fundamental right to vote. The court reviewed the Act under the rational basis test and found that the Act bore a rational relationship to a legitimate governmental interest. The court also found that the Act was consonant with the legislature's duty to facilitate voting and to pass election laws that are general and uniform. The court further found that the mandate of article III that all elections be free and equal was not offended by the Act. The circuit court dismissed count II of plaintiff Orr's complaint and count I of plaintiff Krislov's complaint, finding that the Illinois Supreme Court already had determined that bills passed in January with an immediate effective date need only pass with a simple majority. The circuit court dismissed count III of plaintiff Orr's complaint and count III of plaintiff Krislov's complaint, finding that the Constitution requires the Governor to be provided with the time to sign or veto legislation regardless of whether the General Assembly's term has expired. The circuit court dismissed count IV of plaintiff Orr's complaint and count II of plaintiff Krislov's complaint on the grounds that the enrolled bill doctrine precluded the court from inquiring into whether the legislature complied with its procedural requirements for passage of bills. The court also noted that the Illinois Supreme Court had reserved the right to revisit the issue of whether the use of the enrolled bill doctrine violates the Constitution. Finally, the circuit court dismissed count V of plaintiff Orr's complaint on the grounds that individual public officials do not have standing to sue under the State Mandates Act. The court also found that even if plaintiff Orr had standing, the Act would not violate the State Mandates Act as it imposes no new duties on the Cook County clerk.

We review the trial court's ruling on a motion to dismiss and the court's decision on a motion for summary judgment *de novo*. *Murneigh v. Gainer*, 177 Ill. 2d 287, 298, 685 N.E.2d 1357 (1997); *Pryweller v. Cohen*, 282 Ill. App. 3d 899, 907, 668 N.E.2d 1144 (1996).

Plaintiff Orr's first contention on appeal is that the Act stripped a voting right from Illinois voters. We disagree.

■ It is axiomatic that the right to vote is a fundamental right that deserves zealous protection by the courts. *Tully v. Edgar*, 171 Ill. 2d 297, 306, 664 N.E.2d 43 (1996); *Fumarolo v. Chicago Board of Education*, 142 Ill. 2d 54, 74, 566 N.E.2d 1283 (1990). As such, legislation that infringes upon the right to vote is subject to strict scrutiny.

438

*Tully*, 171 Ill. 2d at 304; *Fumarolo*, 142 Ill. 2d at 74. However, it is as equally well established that the legislature has the right to reasonably regulate the time, place and manner in which the citizens exercise their right to vote. *McDunn v. Williams*, 156 Ill. 2d 288, 316, 620 N.E.2d 385 (1993); *Walgreen Co. v. Illinois Liquor Control Comm'n*, 111 Ill. 2d 120, 488 N.E.2d 980 (1986). Legislation that affects voting in this regard is subject to the rational basis analysis. *Walgreen*, 111 Ill. 2d at 127.

■ Here, we find that the legislation in question does not infringe upon the right to vote. Rather, the legislation affects the manner in which citizens exercise their right to vote. The Act does not prohibit voters from voting a straight-party ballot. Indeed, an individual voter still has the right to cast a ballot entirely for candidates of one political party. The Act only dictates the manner in which the voter may select candidates. Plaintiffs cite *Tully*, 171 Ill. 2d 297, 664 N.E.2d 43, for the proposition that legislation that affects any stage of the election process triggers the strict scrutiny standard of review. In *Tully*, the legislature passed a statute that terminated the terms of the trustees of the University of Illinois after they had been elected to their positions but before the end of their terms. Our supreme court found that the legislation in question affected the voters' fundamental right to vote. *Tully*, 171 Ill. 2d at 306-07. The court found that the legislation "basically eviscerates the election process by providing that, even though the trustees received the majority of votes cast and counted on election day, they are prohibited from holding office for the terms to which they were elected." *Tully*, 171 Ill. 2d at 306. Here, we find no such intrusion into the citizens' right to vote. The Act only affects the manner in which the citizens cast their votes, not the fundamental right to vote. Accordingly, we apply the rational basis analysis to the Act.

■ In order to survive the rational basis test, "the method or means employed in the statute to achieve the stated goal or purpose of the legislation [must be] rationally related to that goal." *In re A.A.*, 181 Ill. 2d 32, 38, 690 N.E.2d 980 (1998). Whether a rational basis exists for legislation presents a question of law, which we review *de novo*. *Jacobson v. Department of Public Aid*, 171 Ill. 2d 314, 323, 664 N.E.2d 1024 (1996). We also presume that the legislation in question is constitutional, and the complaining party has the burden to prove otherwise. *People ex rel. Chicago Bar Ass'n v. State Board of Elections*, 136 Ill. 2d 513, 524, 558 N.E.2d 89 (1990). When a court is faced with a challenge to the validity of a statute, the court's job is to determine whether the act is constitutional, not whether it is wise. *Best v. Taylor Machine Works*, 179 Ill. 2d 367, 390, 689 N.E.2d 1057 (1997).

■ Here, the circuit court found that the Act satisfied the rational basis test. The legislative record reflects that the Act was introduced with a stated purpose of achieving a number of goals, including: · increased voter awareness, the selection of better qualified candidates by the political parties, and an increased involvement by third-party groups in the political process. The circuit court found that the abolition of "one-punch" straight-party voting was rationally related to these governmental interests. Upon reviewing this determination, we are mindful that, " ' "a legislative choice is not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data." ' " *In re A.A.*, 181 Ill. 2d at 40, quoting *Cutinello v. Whitley*, 161 Ill. 2d 409, 421-22, 641 N.E.2d 360 (1994), quoting *Federal Communications Comm'n v. Beach Communications, Inc.*, 508 U.S. 307, 315, 124 L. Ed. 2d 211, 222, 113 S. Ct. 2096, 2102 (1993). The Act, which regulates only the manner in which the citizens exercise their right to vote, represents legislation that is rationally related to a legitimate government interest. We therefore affirm the trial court's ruling.

Plaintiff Orr also maintains that the Act violates the due process and equal protection clauses of the Illinois Constitution (Ill. Const. 1970, art. I, § 2) and the Illinois constitutional provisions regarding the right to vote (Ill. Const. 1970, art. III, § 1 *et seq.*). Specifically, plaintiff Orr argues that the constitutional provisions requiring the State to facilitate voting for all qualified persons and to adopt election laws that are general and uniform (Ill. Const. 1970, art. III, § 4) are violated when the Act is coupled with section 17—11 of the Election Code (10 ILCS 5/17—11 (West 1994)), which provides that no voter shall spend more than five minutes in a voting booth if other voters are waiting. Plaintiff Orr maintains that the Act will be especially harmful to the voting rights of the elderly and handicapped in Cook County because of the extremely long ballots in Cook County.

■ The Act does not impede voting by all qualified persons. As pointed out by defendants, a "one-punch" straight-party vote is not available to the voters who participate in the primary elections. In Cook County, primary election ballots routinely contain the names of many more candidates than are on the general election ballot. The unavailability of "one-punch" voting has not prevented the elderly and handicapped from fully exercising their voting rights in primary elections. Plaintiff Orr has presented no basis to believe that their participation in general elections will be negatively impacted by the absence of "one-punch" straight-party voting. Further, as noted by the trial court, the time limitations of section 17—11 are not intended to rush impeded voters, but are meant to ensure that ballot casting

itself is not utilized as a stalling tactic by those motivated to prevent others from voting.

■ As to plaintiff Orr's assertion that the Act violates the constitutional requirement that election laws be general and uniform, the Act's applicability is uniform throughout the state.

■ Finally, we note that the "one-punch" straight-party vote was first adopted by the legislature in 1891 and abolished in 1997. "One-punch" voting currently is not available to voters in 31 states. We reject plaintiff Orr's contention that such a voting method constitutes a fundamental right that cannot be revisited by the legislature. There is no vested right in the mere continuance of a law—the legislature retains an ongoing right to amend a statute. *First of America Trust Co. v. Armstead*, 171 Ill. 2d 282, 291, 664 N.E.2d 36 (1996). We affirm the circuit court's rulings on these issues.

Plaintiff Orr's second contention on appeal (plaintiff Krislov's second issue on appeal) is that the General Assembly violated the three-fifths majority vote requirement necessary to pass the Act with an immediate effective date. The 89th General Assembly first convened on January 11, 1995. The legislature then reconvened for its second legislative session on January 10, 1996. Then, as has become common practice during the past decade and a half, the legislature convened for a third January session on January 6 and 7, 1997. It was during this third January session that the General Assembly passed the Act by a simple majority and with an immediate effective date.

Article IV, section 10, of the Illinois Constitution provides:

> "The General Assembly shall provide by law for a uniform effective date for laws passed prior to June 1 of a calendar year. The General Assembly may provide for a different effective date in any law passed prior to June 1. A bill passed after May 31 shall not become effective prior to June 1 of the next calendar year unless the General Assembly by the vote of three-fifths of the members elected to each house provides for an earlier effective date." Ill. Const. 1970, art. IV, § 10.

The enabling act for this provision provides the following:

> "A bill passed after May 31 of a calendar year shall become effective on June 1 of the next calendar year unless the General Assembly by a vote of three-fifths of the members elected to each house provides for an earlier effective date in the terms of the bill or unless the General Assembly provides for a later effective date in the terms of the bill; provided that if the effective date provided in the terms of the bill is prior to the date the bill becomes a law then the date the bill becomes a law shall be the effective date." 5 ILCS 75/2 (West 1996).

Plaintiffs maintain that the 89th General Assembly had only two op-

portunities to pass the Act with a simple majority and an immediate effective date: from January 11, 1995, to May 31, 1995, and from January 10, 1996, to May 31, 1996. Plaintiffs contend that the framers of the Constitution did not intend for the General Assembly to be able to pass a bill with a simple majority and an immediate effective date after June 1 of the second year of a legislative term.

The circuit court disagreed with plaintiffs and found that a simple majority was sufficient to pass an act with an immediate effective date during a third January session. In reaching its decision, the circuit court followed the reasoning set forth by our supreme court in *Polich v. Chicago School Finance Authority*, 79 Ill. 2d 188, 208, 402 N.E.2d 247 (1980). In *Polich*, the supreme court was faced with the issue of whether a bill introduced during March of the first legislative session and passed during January of the second session required a three-fifths majority vote in order to have an immediate effective date. The court found that only a simple majority was required. *Polich*, 79 Ill. 2d at 208. In *Polich*, the appellants argued that when article IV, section 10, of the Constitution spoke of laws passed prior to July 1 (now June 1), it was contemplated that such bills would have been introduced after the legislature convened on the second Wednesday of that calendar year. Our supreme court rejected this argument, pointing out that the constitutional provision "referred to a bill 'passed prior to July 1 of a calendar year' without regard to when the bill may have been filed or its prior course through the legislative process. [Citations.] In our opinion, this clear and explicit constitutional provision requires no construction ***." *Polich*, 79 Ill. 2d at 208.

Here, plaintiffs argue that article IV, section 10, was not meant to apply to bills introduced by an outgoing legislature immediately prior to the end of the legislature's term. While this case concerns a bill passed in a legislature's third January session, rather than its second January session as in *Polich*, the analysis does not change. The supreme court found that article IV, section 10, of the Constitution was a "clear and explicit constitutional provision [that] required no construction." *Polich*, 79 Ill. 2d at 208.

■ Upon reviewing the constitutionality of a statute, there is a judicial presumption in favor of finding the statute constitutional. *Mulligan v. Joliet Regional Port District*, 123 Ill. 2d 303, 312, 527 N.E.2d 1264 (1988). However, this court must avoid rendering an interpretation that would make an enactment absurd and illogical. *Mulligan*, 123 Ill. 2d at 312-13; *Midwest Bank & Trust Co. v. Roderick*, 132 Ill. App. 3d 463, 470, 476 N.E.2d 1326 (1985). Statutes must be construed in a manner that prevents hardship or injustice and that opposes prejudice to public interests. *Mulligan*, 123 Ill. 2d at 313. We

also note that appellate courts "are without authority to overrule the supreme court or to modify its decisions." *Rickey v. Chicago Transit Authority*, 98 Ill. 2d 546, 551, 457 N.E.2d 1 (1983).

■ In the present cause, we agree with the circuit court and find that only a simple majority was necessary to pass the Act with an immediate effective date during a third January session. Plaintiffs advance persuasive arguments as to why a three-fifths majority was required to pass the Act with an immediate effective date. Plaintiffs point out, and defendants agree, that if the Act had been voted on between June 1, 1996, and December 31, 1996, it would have required a three-fifths majority to pass with an immediate effective date. This being so, plaintiffs argue that it is absurd to allow the legislature to pass a statute with a simple majority in a third January session and have it be immediately effective. Plaintiffs also cite the floor comments offered by the delegates to the Constitutional Convention of 1970 to support their proposition that the framers of the Constitution did not contemplate the legislature being in session in the third January of their legislative term. Plaintiffs assert that had the framers considered such a possibility, they would have required any bill passed in such a third January session to be passed with a three-fifths majority if it included an immediate effective date.

We do not reach the issue of the intent of the framers of article IV, section 10, of the Constitution. Ill. Const. 1970, art. IV, § 10. It is fundamental that the appellate court does not have the authority to abandon supreme court precedent. *Niziolek v. Chicago Transit Authority*, 251 Ill. App. 3d 537, 549, 620 N.E.2d 1097 (1993); *Rickey*, 98 Ill. 2d at 551. If precedent is not followed, the uniformity and stability of decisions, which are essential to the proper administration of justice, will be destroyed. *Niziolek*, 251 Ill. App. 3d at 549.

Our supreme court has ruled that article IV, section 10, is "clear and explicit" and "requires no construction." *Polich*, 79 Ill. 2d at 208. Thus, we are compelled to apply the plain meaning of the language of article IV, section 10, to the present case without the use of extrinsic aids. *Baker v. Miller*, 159 Ill. 2d 249, 257, 636 N.E.2d 551 (1994). As the circuit court properly found, if the continued vitality of this constitutional interpretation is ripe for reexamination, such a task should be undertaken by the tribunal that rendered the interpretation.

Since the *Polich* decision was rendered in 1980, the General Assembly has met in a third January session in each legislative term. As noted by the trial court, it is not unreasonable to conclude that the General Assembly began meeting in a third January session in reliance upon the interpretation of article IV, section 10, rendered by the

coordinate branch of government authorized to make such determinations. When the General Assembly makes a practical construction of a law over the years, that construction is entitled to great weight when determining whether it is valid. *Droste v. Kerner*, 34 Ill. 2d 495, 500, 217 N.E.2d 73 (1966). The enabling act for article IV, section 10, contains almost identical language and fails to support plaintiffs' argument that the legislature cannot pass an immediately effective bill with a simple majority in a third January session. Further, the 88th General Assembly proposed an amendment to article IV, section 10, that was approved by voter referendum on November 8, 1994. Had the General Assembly wished to amend or clarify the language of article IV, section 10, it certainly could have done so at that time. Finally, given our finding that the Act is constitutional as passed, we need not address whether the effective date of the Act is severable.

Plaintiff Orr's third contention on appeal (plaintiff Krislov's third issue on appeal) is that the Act never became law since it was not enacted during the life of the 89th General Assembly. As discussed above, the 89th General Assembly passed the Act on January 7, 1997. On January 8, 1997, the 89th General Assembly ceased to exist pursuant to article IV, section 5(a), of the Constitution. Ill. Const. 1970, art. IV, § 5(a). Governor Edgar signed the bill into law on January 17, 1997. Plaintiffs maintain that the Governor cannot sign legislation after a session of the General Assembly has permanently adjourned because the Governor could veto the legislation without recourse from the legislature. Thus, the system of checks and balances between the executive branch and legislative branch would be tilted in favor of the executive branch. According to plaintiffs, such a system undermines the Constitution, and the situation can only be remedied by a judicial finding that all unsigned legislation expires at the end of a General Assembly's term.

In support of their argument, plaintiffs cite to article IV, section 9, the relevant portion of which provides:

"(b) If the Governor does not approve [a] bill, he shall veto it by returning it with his objections to the house in which it originated. Any bill not so returned by the Governor within 60 calendar days after it is presented to him shall become law. If recess or adjournment of the General Assembly prevents the return of a bill, the bill and the Governor's objections shall be filed with the Secretary of State within such 60 calendar days. The Secretary of State shall return the bill and objections to the originating house promptly upon the next meeting of the *same* General Assembly at which the bill can be considered." (Emphasis added.) Ill. Const. 1970, art. IV, § 9.

The drafters of the Constitution directed that all vetoed bills be returned to the General Assembly in which they originated. Thus, according to plaintiffs, all unsigned legislation must expire when a General Assembly permanently adjourns because a vetoed bill will never return to that General Assembly. Plaintiffs raise an interesting point, but that issue currently is not before this court. The issue before this court is whether legislation approved by the Governor after the final adjournment of a General Assembly is valid. We find that such legislation is valid.

Initially, we note that the Illinois General Assembly is a continuous body for its 24-month term, and, as plaintiffs concede, the legislature is capable of passing laws at any point during its tenure. Ill. Const. 1970, art. IV, § 5(a); *First of America Trust Co.*, 171 Ill. 2d at 290. Further, the Governor has 60 calendar days from the date that a bill is presented to him or her in which to sign or veto the bill. Ill. Const. 1970, art. IV, § 9(b). Adoption of plaintiffs' position would necessarily invalidate either article IV, section 5(a), or article IV, section 9(b).

As recognized by plaintiffs, defendants, and the trial court, "if separate parts of a constitution appear to be in conflict, courts should favor a construction which will render every provision operative." *Walker v. State Board of Elections*, 65 Ill. 2d 543, 556, 359 N.E.2d 113 (1976). The United States Supreme Court addressed the issue of executive action taken on legislation after the legislature had adjourned in the "Pocket Veto" case. *Okanogan, Methow, San Poelis, Nespelem, Colville, & Lake Indian Tribes or Bands v. United States*, 279 U.S. 655, 73 L. Ed. 894, 49 S. Ct. 463 (1929) (*Pocket Veto*). There, Congress passed legislation on June 24 and adjourned on July 3. Congress was not in session on July 6, the tenth day after the bill had been presented to the President. Article I, section 7, of the Constitution of the United States provides that the President has 10 days to sign or veto a bill passed by both houses of Congress. If the President has neither signed the bill nor vetoed it by returning it to the house in which it originated within 10 days of its presentation to him, the bill becomes law. U.S. Const., art. I, § 7.

In *Pocket Veto*, the President had neither signed nor vetoed the bill before Congress adjourned nine days after its passage. The issue to be decided by the United States Supreme Court was whether the bill became law without the President's signature in circumstances where Congress by its adjournment prevented the President from returning the bill within 10 days after its presentation. The Supreme Court held that the power conferred under article I, section 7, to approve or veto legislation cannot be reduced by Congress nor can the time allotted

for the exercise of the power be lessened. *Pocket Veto,* 279 U.S. at 677-78, 73 L. Ed. at 897, 49 S. Ct. at 465-66. Therefore, the bill did not become law.

In *Edwards v. United States,* 286 U.S. 482, 76 L. Ed. 1239, 52 S. Ct. 627 (1932), the Supreme Court held that under article I, section 7, of the United States Constitution, a bill signed by the President within 10 days after it was presented to him, but after the final adjournment of the Congress that had passed it, became law. The reasoning behind this holding is especially significant to the instant case:

> "There is nothing in the words of the Constitution which prohibits the President from approving bills, within the time limited for his action, because the Congress has adjourned, and the spirit and purpose of the clause in question forbid the implication of such a restriction. The provision that a bill shall not become a law if its return has been prevented by the adjournment of Congress is apposite to bills that are not signed, not to those that are signed. There is no requirement that bills that are signed should be returned. No further action is required by Congress in respect of a bill which has been presented to the President, unless he disapproves it and returns it for reconsideration as the Constitution provides." *Edwards,* 286 U.S. at 492, 76 L. Ed. at 1244, 52 S. Ct. at 630-31.

The Illinois Supreme Court in *People ex rel. Petersen v. Hughes,* 372 Ill. 602, 25 N.E.2d 75 (1939), cited both *Pocket Veto* and *Edwards* when it held that, under the Illinois Constitution of 1870, the General Assembly had authority to present bills to the Governor after adjournment and that the time accorded to the Governor to consider bills presented cannot be reduced by adjournment of the legislature. Plaintiffs distinguish *Hughes* from the instant case on the basis that the adjournment in *Hughes* occurred 1½ years prior to expiration of the General Assembly's term. The adjournment in *Hughes,* as in the case *sub judice,* was "*sine die.*" *Hughes,* 372 Ill. at 604. Black's Law Dictionary defines *sine die* as "[w]ithout day," "[a] final adjournment." Black's Law Dictionary 1385 (6th ed. 1990).

In addressing the distinction advanced by plaintiffs, the Supreme Court in *Edwards* sustained the President's authority to approve bills when Congress was not in session, so long as the approval was within the time limit set forth in the Constitution. The Supreme Court found that its holding "applies with as much force to the case of an adjournment, whether it is at the close of a session or is the final adjournment of the Congress, as to the case of a recess for a specified period." *Edwards,* 286 U.S. at 490, 76 L. Ed. at 1243, 52 S. Ct. at 630.

As in *Edwards,* the instant case involves a bill that was signed,

not vetoed, by the Governor. No further action was required by the General Assembly to implement passage of the bill. Finally, when the adjournment of the legislature prevents that legislature from being able to override any potential veto by the head of the executive branch, such loss of the legislative prerogative is attributed solely to the action of the legislature. *Pocket Veto*, 279 U.S. at 678-79, 73 L. Ed. at 897, 49 S. Ct. at 466. Accordingly, we hold that the legislature has authority to present bills to the Governor after adjournment, and if the Governor signs such bills within the time accorded under the Constitution, those bills become law.

Plaintiff Orr's fourth contention on appeal (plaintiff Krislov's first issue on appeal) is that the General Assembly violated the three-readings requirement of the Illinois constitution.

Article IV, section 8(d), of the Constitution states that "[a] bill shall be read by title on three different days in each house." Ill. Const. 1970, art. IV, § 8(d). Here, it is not disputed that the Act was read only one time in each house before its passage. The circuit court found that it was precluded from inquiring into the constitutionality of this legislative process due to the enrolled bill doctrine. The enrolled bill doctrine creates a presumption that a bill was properly passed if the speaker of the house of representatives and the president of the senate signed the bill to certify that the procedural requirements for passage have been met. Ill. Const. 1970, art. IV, § 8(d); *Geja's Cafe v. Metropolitan Pier & Exposition Authority*, 153 Ill. 2d 239, 259, 606 N.E.2d 1212 (1992).

Our supreme court has affirmed the use of the enrolled bill doctrine on numerous occasions. The court first addressed the doctrine in *Fuehrmeyer v. City of Chicago*, 57 Ill. 2d 193, 198, 311 N.E.2d 116 (1974), where it held that the verification of procedural matters is within the province of the presiding officers of the House and Senate. The court revisited the doctrine in *Benjamin v. Devon Bank*, 68 Ill. 2d 142, 368 N.E.2d 878 (1977), where it cited the legislative committee notes from the Constitutional Convention of 1970. The notes make it clear that the framers understood the enrolled bill doctrine to mean that when the president of the Senate and speaker of the House each sign a bill, their signatures become conclusive proof that all constitutional procedures were properly followed during the passage of the bill. *Benjamin*, 68 Ill. 2d at 272; see also *Polich*, 79 Ill. 2d at 211. Then, in *Geja's*, the court issued a warning to the legislature about the use of the doctrine and noncompliance with the three-readings requirement. Specifically, the court made the following finding:

> "Plaintiffs urge us to abandon the enrolled bill doctrine because history has proven that there is no other way to enforce the

constitutionally mandated three-readings requirement. While plaintiffs make a persuasive argument, we decline their invitation. We do so because, for today at least, we feel that the doctrine of separation of powers is more compelling. However, we defer to the legislature hesitantly, because we do not wish to understate the importance of complying with the Constitution when passing bills. If the General Assembly continues its poor record of policing itself, we reserve the right to revisit this issue on another day to decide the continued propriety of ignoring this constitutional violation." *Geja's*, 153 Ill. 2d at 260.

The court, however, has not exercised its right to revisit the issue in subsequent opinions. See *Cutinello v. Whitley*, 161 Ill. 2d 409, 641 N.E.2d 360 (1994); *People v. Dunigan*, 165 Ill. 2d 235, 650 N.E.2d 1026 (1995) (Heiple, J., dissenting); *Cincinnati Insurance Co. v. Chapman*, 181 Ill. 2d 65, 691 N.E.2d 374 (1998).

 Constitutional violations of any nature are of great concern to this court. And while we acknowledge the importance of strict compliance with the mandates of the Constitution, we decline to deviate from the enrolled bill doctrine in this context due to our supreme court's holding in *Geja's*. In *Geja's*, our supreme court expressly reserved the right to revisit this issue. *Geja's*, 153 Ill. 2d at 260. This court is bound by the decisions of the supreme court. *Rickey*, 98 Ill. 2d at 551; *Niziolek*, 251 Ill. App. 3d at 548; *Vonholdt v. Barba & Barba Construction, Inc.*, 276 Ill. App. 3d 325, 329, 657 N.E.2d 1156 (1995), *aff'd on other grounds*, 175 Ill. 2d 426, 677 N.E.2d 836 (1997). Thus, we leave to our supreme court the issue of whether the state legislature may disregard constitutional requirements and maintain the legality of its actions under the auspices of the enrolled bill doctrine. As such, we affirm the ruling of the circuit court.

Plaintiff Orr's final contention on appeal is that the Act violates the State Mandates Act and that plaintiff Orr has standing to challenge this violation.

Under the State Mandates Act, the state must reimburse units of local government if the state creates new programs or expands existing ones that increase the costs to a local government. 30 ILCS 805/2 (West 1994); *Board of Education of Maine Township High School District 207 v. State Board of Education*, 139 Ill. App. 3d 460, 462, 487 N.E.2d 1053 (1985); *County of Macon v. Board of Education of Decatur School District No. 61*, 165 Ill. App. 3d 1, 8, 518 N.E.2d 653 (1987). Plaintiff Orr argues that the Act actually is a service mandate as defined under section 3(f) of the State Mandates Act, and that the State therefore must reimburse Orr's office for at least 50% of the additional expenses that the office will incur by complying with the Act.

30 ILCS 805/3(f) (West 1994); *Board of Trustees of Community College District No. 508 v. Burris*, 118 Ill. 2d 465, 469, 515 N.E.2d 1244 (1987). Plaintiff Orr maintains that the abolition of "one-punch" straight-party voting will require a greater number of voting machines to accommodate all of the voters in a timely manner. Section 17—11 of the Election Code provides that no voter shall spend more than 10 minutes in a voting booth and that a voter may only spend up to five minutes in the booth if other voters are waiting. 10 ILCS 5/17—11 (West 1994). It is Orr's position that his office cannot comply with requirements of section 17—11 with the current number of voting machines in Cook County. This is so because the abolition of "one-punch" voting will require voters to spend more time in the voting booth as they must now review each of the election races individually. Orr calculates that his office will need $900,000 for the November 1998 election in order to have a sufficient number of machines to comply with the time restrictions of section 17—11. Upon considering a motion to dismiss pursuant to section 2—615 of the Code, all well-pleaded facts must be taken as true. *Connick v. Suzuki Motor Co.*, 174 Ill. 2d 482, 490, 675 N.E.2d 584 (1996). Defendants argue that the Act does not require Orr to purchase any new machines. By statute, Orr is only required to provide enough voting machines so that each precinct has at least one machine for every 75 people who voted in the previous election. 10 ILCS 5/17—8 (West 1994). Defendants further assert that the Act itself imposes no additional duties on Orr.

The circuit court found that Orr did not have standing to bring an action under the State Mandates Act. The court rejected Orr's argument that he had standing by virtue of his position as Cook County clerk. Orr cites to *People ex rel. Issacs v. Johnson*, 26 Ill. 2d 268, 186 N.E.2d 346 (1962), in support of his position that public officials may question the constitutionality of a state statute. However, the court in *Johnson* held that a public official may challenge the constitutionality of legislation when he or she is being sued in a *mandamus* action to compel performance of duties. *Johnson*, 26 Ill. 2d at 271. The facts in the instant case are completely inapposite to those in *Johnson*. The circuit court also noted that no reported cases have ruled that individual public officials have standing under the State Mandates Act. See generally *Orr v. Edgar*, 283 Ill. App. 3d 1088, 1097 n.1, 670 N.E.2d 1243 (1996) (holding that the City of Chicago had standing to sue under the State Mandates Act). We agree with the circuit court. The State Mandates Act applies to units of local government. "Local government" is defined in the act as "a municipality, county, township, other unit of local government, school district, or community college district." 30 ILCS 805/3(a) (West 1994). The Il-

linois Constitution defines units of local government as "counties, municipalities, townships, special districts, and units, designated as units of local government by law." Ill. Const. 1970, art. VII, § 1. In order to have standing under the act, the plaintiff must be a unit of local government. Here, Orr does not qualify as a unit of local government per the definition set forth in the State Mandates Act, nor under the definition set forth in the Constitution. Therefore, the circuit court properly ruled that Orr did not have standing to bring an action under the State Mandates Act.

In light of the foregoing, we affirm the judgment of the circuit court of Cook County.

Affirmed.

HOFFMAN, J., concurs.

JUSTICE ZWICK, dissenting:

I respectfully dissent.

As the majority has noted, the defendants readily concede that passage of this act was done in violation of article IV, section (d), of our state constitution. Notwithstanding this concession, it is the majority's view that the enrolled bill doctrine is an absolute bar to judicial examination of the clearly unethical and perhaps even fraudulent conduct of the speaker of the House and the president of the Senate in certifying that this legislation was read on three separate days. It is on this single but critically important point that I depart from my colleagues.

The three-readings requirement for enacting legislation found in article IV, section 8(d), serves two distinct functions. The first is procedural. By providing that each bill be read "by title" on the floor of each house, it assures that every member of the General Assembly receives fair notice of pending legislation. In furtherance of this purpose, section 8(d) also provides that new legislation must be "reproduced and placed on the desk of each member before final passage." Ill. Const. 1970, art. IV, § 8(d). After a bill is passed, the speaker of the House and the president of the Senate certify that all the procedural requirements necessary for its passage into law have been faithfully met. When legislation is so certified, the enrolled bill doctrine, as the majority notes, precludes a court challenge on the basis that the proper notices had not been given. Thus, the legislation becomes procedurally unassailable.

The three-readings requirement also serves a substantive purpose, a function that has never before been put at issue on appeal. By requir-

ing that every bill be read publicly "on three different days," section 8(d) creates a specific period of time during which members of the General Assembly, the media, and the public have the opportunity to inform themselves about pending changes in Illinois law. The three-day requirement also presents a window of opportunity when our citizenry can contact their representatives to urge a vote in favor of or against pending legislation. In this case, where the bill was read only once on the same day that it was passed, even the press, armed with satellite uplinks and high-speed internet connections, could not have disseminated the potential effects of this law before it was set for vote.

The majority cites several cases in which our supreme court has invoked the enrolled bill doctrine to uphold legislation against constitutional attack similar to that now made by the plaintiffs. See *People v. Dunigan*, 165 Ill. 2d 235, 650 N.E.2d 1026 (1995); *Cutinello v. Whitely*, 161 Ill. 2d 409, 641 N.E.2d 360 (1994); *Geja's Cafe v. Metropolitan Pier & Exposition Authority*, 153 Ill. 2d 239, 606 N.E.2d 1212 (1992); *Fuehrmeyer v. City of Chicago*, 57 Ill. 2d 193, 311 N.E.2d 116 (1974). These cases are distinguishable. Except in *Geja's Cafe*, the defendants in each of these cases argued that the passage of the Act *complied* with the three-readings requirement. Thus, in all of those cases but *Geja's Cafe*, the court was presented with a good-faith argument that the particular act in question had been read in conformity with the constitutional mandate. Because those cases presented a genuine issue as to whether the procedural requirements had been met, the court elected, out of concern for separation of powers, to reasonably rely upon the certifications of the speaker of the House and the president of the Senate. In stark contrast to those cases, the defendants here *concede* that the Act was not read three times on three different days, as constitutionally mandated by article IV, section 8(d).

*Geja's Cafe* is similar to the instant case in that the defendants there acknowledged that the act had not been properly read in accordance with article IV, section 8(d). In that case, however, the supreme court noted that the enrolled bill doctrine had been designed to preclude invalidation of legislation on " 'some procedural error or technicality.' " *Geja's Cafe*, 153 Ill. 2d at 259, quoting 6 Record of Proceedings, Sixth Illinois Constitutional Convention 1386-87. Unlike the facts at issue in *Geja's Cafe*, where the General Assembly was found to have regularly ignored the three-readings requirement (see *Geja's Cafe*, 153 Ill. 2d at 260), the case at bar does not present such a technical or "purely procedural" (*Geja's Cafe*, 153 Ill. 2d at 259) challenge. Rather, we are confronted with a case in which it is undisputed that the speaker of the House and the president of the Senate

deliberately and shamelessly falsified their certifications regarding passage of the Act knowing that the bill was fundamentally defective. As the majority has observed, this act had been introduced for the first time on the very last day of the legislative session. At this point in time, section 8(d) made the enactment of newly introduced legislation constitutionally impossible. It should be noted that the very next day, indeed, the very next hour, the opposite political party took majority control of the House of Representatives. The deliberate falsification of the certifications required by section 8(d) to achieve passage of a defective bill that would have otherwise lapsed is unprecedented. Certainly our supreme court never intended to give its judicial imprimatur to such extraordinary and reprehensible conduct by its application of the enrolled bill doctrine, and never before has this doctrine been used to shield such patent dishonesty.

Taken to its logical extreme, the enrolled bill doctrine, interpreted as the majority suggests, would force this court to uphold legislation against constitutional attack even if it were conceded that a majority of the members of the House and Senate had voted *against* its passage, so long as the president of the Senate and speaker of the House had issued certifications indicating that all procedures had been properly followed. See *Dunigan*, 165 Ill. 2d at 258 (Heiple, J., dissenting). This certainly cannot be the law of Illinois.

Unfortunately, what was true more than 130 years ago necessarily remains true today: "[N]o man's life, liberty or property are safe while the Legislature is in session." *Final Accounting in the Estate of A.B.*, 1 Tucker (N.Y. Surr.) 247, 249 (1866). The drafters of our constitution wisely recognized the awesome power our General Assembly wields over the lives of our citizenry and tempered that power with a requirement that all legislation be announced on three separate days before it can be enacted into law. The failure to read this legislation on three separate days in this case was no mere "technical omission." Rather, its passage, after 11 p.m. on the last day of the legislative session, with no previous warning, was an unprincipled ambush, a final power grab by a political party that had been relegated by the voters in the previous election to serve a minority role during the next legislative term in the House. This was, and there is no kinder way to say it, the act of desperate legislative leaders unwilling to subject their handiwork to the public scrutiny required by our state's constitution. The enrolled bill doctrine was never intended to be applied in such circumstances. It should not be applied here.

In this case, the Act is plainly unconstitutional. Accordingly, I respectfully but most vigorously dissent.